**James HUNT, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2006–SC–000634–MR.

Supreme Court of Kentucky.

Nov. 25, 2009.

As Corrected Jan. 6, 2010.

As Modified on Denial of Rehearing March 18, 2010.

---

1. See *Daugherty v. Runner*, 581 S.W.2d 12 (Ky.App.1978)

Shelly R. Fears, Randall Wheeler, Julia Karol Pearson, Assistant Public Advocates, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Matthew Robert Krygiel, Assistant Attorney General, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice VENTERS.

Appellant, James Hunt, appeals from a judgment entered upon a jury verdict by the Floyd Circuit Court convicting him of murder, first-degree burglary, and first-degree wanton endangerment. He was sentenced to death for the murder conviction and twenty years and five years, respectively, for the burglary and wanton endangerment convictions. He now appeals his conviction as a matter of right pursuant to Ky. Const. § 110(2)(b), raising twenty-four enumerated arguments. For the reasons stated below, we affirm.

### *FACTUAL AND PROCEDURAL BACKGROUND*

Hunt and the victim, Bettina Hunt, were married in 1991. During their relationship the couple had recurring problems. Bettina had petitioned for domestic violence protective orders against Hunt in 1998 and 2002. She filed for divorce in 2002, and again in July 2004—four months prior to her murder.

In the months before the murder, the couple was again having considerable problems. Much of the strain was related

to Bettina's preoccupation with her drug-addicted daughter from a prior marriage, Veronica Harris, and Veronica's newborn baby, Katrina. Katrina was born prematurely and suffered from severe health problems requiring round-the-clock care. After the baby's birth, Bettina gained custody of the child and during the months preceding her murder spent much of her time taking care of the infant.

In November 2004, Bettina was separated from Hunt and lived with Katrina at a residence owned by her mother, located on Buck Branch Road in Floyd County, Kentucky. Her former sister-in-law, Lula Dillon, came to the residence five to six days a week to help Bettina take care of Katrina and was there on Tuesday, November 30, 2004. Lula testified that Hunt called several times that day, including a call that came in at about 6:20 to 6:25 p.m. Lula noted that the conversation was argumentative and that Bettina told Hunt she intended to see a divorce lawyer in a few days and wanted to go through with the divorce. Lula left the residence just after the phone conversation ended.

Shortly thereafter, Bettina placed a call to her brother.[1] He was not home; and Bettina ended up speaking with her sister-in-law, Karen Chaffins. The two talked at length about a variety of issues involving Hunt. A few minutes after 7:00 p.m., Bettina told Karen that "he"—meaning Hunt—was at the door, that she would send him away, and that she would then call Karen right back.[2] According to phone records, that phone call ended at 7:05 p.m.

Three minutes later, at 7:08 p.m., Bettina called 911. A recording of the call began when emergency dispatch personnel answered the line; however, it appears that Bettina was unaware that the call had been answered as she did not communicate the emergency to the 911 operator.

On the 911 recording, a threatening male voice and a panicked female voice can be heard. The male voice can be heard saying, "maybe if I shoot you—you (inaudible)." The female voice is heard pleading with the man—stating in a terrified tone—"no, I promise" and "stop—please no." After additional inaudible conversation and commotion, the same threat to shoot the woman is repeated; and again the woman is heard begging for her life. Subsequently, a gunshot is heard. The woman can be heard crying hysterically and frantically screaming. A second shot is then heard, followed by silence.

A short time later and only a few hundred feet from the murder scene, Hunt ran his car off of a bridge. The vehicle landed upside down and became partially submerged in the creek below. Various passers-by stopped to assist Hunt. When one of them, Judy Flannery, first observed Hunt, she noticed that he held something in his left hand. Hunt walked behind a nearby tree; and when he reemerged, his hands were empty. The next day Judy's husband, Rabon Flannery, searched the area near the tree where Judy believed she saw Hunt leave something. Rabon found a silver Smith & Wesson .357 revolver, later determined to be the murder weapon, in the creek. The confirmation that the revolver was the murder weapon was based upon a matching of the revolver to spent rounds discovered at the murder scene.

Soon after the shooting, police officers arrived at the scene of the wreck and

---

1. Phone records reflect that Bettina's call to her brother was made at 6:27 p.m.

2. While Bettina did not specifically refer to Hunt by name, Karen knew that was whom she was referring to because they had been talking about Hunt when he came to the door.

arrested Hunt, who was visibly intoxicated. He denied any knowledge of the nearby shooting. His vehicle was pulled from the creek. While walking around the vehicle, Detective Dwayne Price observed a shell casing resting on the rubber window seal where the glass for the passenger-side window opens and closes. Price took possession of the shell casing. Later testing determined it to have been fired from the murder weapon. Similarly, ballistics testing of other shell casings found at the murder scene determined that they were fired from the same weapon. The spent rounds were of a relatively unusual type of .38 caliber ammunition.[3] It was later determined that Hunt had several unspent rounds of the same unusual ammunition in his jacket pocket.

Other forensic evidence also linked Hunt to the murder. For example, the clothing worn by Hunt on the date of the murder was examined by forensic experts. DNA testing conclusively determined that blood found in two locations on Hunt's jacket was Bettina's. In addition, blood taken from a juice bottle located on Bettina's kitchen table was conclusively linked to Hunt. Similarly, blood from part of a t-shirt stuffed inside the bottle and a band-aid attached to the bottle were also matched to Hunt.[4]

Hunt was originally indicted only for murder and first-degree burglary. A superseding indictment adding first-degree wanton endangerment as a charge was later returned. A jury trial was held, beginning May 15, 2006, and concluding June 1, 2006. Hunt's defense was that someone else committed the crimes. Following the presentation of evidence, the jury returned guilty verdicts on all three charges. Hunt was sentenced to death on the murder charge and to twenty years and five years, respectively, on the burglary and wanton endangerment charges. This appeal followed. We address the twenty-four enumerated issues raised by Hunt in the order they are presented in his brief.

## I. THE TRIAL COURT DID NOT ERR BY FAILING TO SUPPRESS THE SHELL CASING RECOVERED FROM HUNT'S VEHICLE.

As Detective Dwayne Price was on his way to the scene of the shooting, he came upon the accident scene at the bridge. Detective Price knew that Hunt was the driver of the vehicle and that he was a suspect in the shooting. After the vehicle was removed from the creek and turned over, Detective Price performed a cursory search of the passenger compartment of the vehicle for any evidence that may have related to the shooting. As he walked around the exterior of the car, he observed a shell casing located on the rubber seal of the front passenger window. The window was either rolled down or had shattered in the crash; and the casing was in plain view to Detective Price, as demonstrated by a photograph taken of the casing in the position it was originally found.

Prior to trial, Hunt filed a motion to suppress the casing upon the grounds that it was seized in a warrantless search not subject to any exception to the warrant requirement. The motion was heard along with various other pretrial motions. A formal evidentiary hearing was not held, and no witnesses were called. Instead, the

---

**3.** The .357 caliber revolver was capable of firing the .38 caliber ammunition.

**4.** As discussed elsewhere in this opinion, it was the Commonwealth's theory that the juice bottle was a makeshift silencer brought to the scene by Hunt; however, evidence indicates that it was not actually used for this purpose. Testing showed that no shots had been fired through it.

trial court considered the motion based upon factual representations and arguments made by counsel for Hunt and the Commonwealth. Ultimately, the trial court denied the motion to suppress for three reasons: (1) the casing was in plain view, (2) a cursory search was proper under the totality of the circumstances, and (3) the casing would have inevitably have been discovered (if it survived the tow-trip) the next day when a search pursuant to a warrant was made of the vehicle.

Hunt now argues that reversible error occurred as a result of the trial court's failure to hold an evidentiary hearing as prescribed by RCr 9.78. We disagree.

 RCr 9.78 states that upon considering a motion to suppress, "the trial court shall conduct an evidentiary hearing." The statute uses the mandatory "shall," and we agree with Hunt that the trial court does not have discretion to dispense with the hearing. *See Mills v. Commonwealth*, 996 S.W.2d 473, 481 (Ky.1999) (holding that the trial court was required to hold evidentiary hearing on defendant's motion to suppress his confession regardless of fact that defendant requested only in camera review of videotape of arrest and confession). Nevertheless, failure to hold an evidentiary hearing on a motion to suppress is subject to harmless error review, even in a capital case. *Id.* Because the subsequent trial testimony of Detective Price and the photographic evidence establishing the location of the casing make clear the factual background of the casing's discovery, we are persuaded that the failure to hold an evidentiary hearing was, under these circumstances, harmless. *See Id.* (holding that failure to hold suppression hearing was rendered harmless by a video taped confession).

 It is undisputed that the casing was found resting on the passenger side rubber window seal. Detective Price's contempo-raneous photograph makes clear that the casing was easily observable from outside the vehicle. It is also clear that the glass of the window either was rolled down or had shattered in the wreck; and, thus, the casing could, if left in its place while the vehicle was being towed, have fallen out of the vehicle. It is further undisputed that Detective Price knew of the nearby murder and that Hunt was a suspect in the shooting. While there may be other theories justifying denial of the suppression motion, we believe the plain view and exigent circumstances doctrines, in combination (if not individually), easily excuse Detective Price's warrantless seizure of the casing.

 Although a warrantless search is presumed to be unreasonable and unlawful, the presumption can be overcome when evidence is seized under the plain view doctrine. *Commonwealth v. Hatcher*, 199 S.W.3d 124, 126 (Ky.2006). Under this exception to the warrant requirement, law enforcement officials may seize evidence without a warrant when the initial entry was lawful, the evidence was inadvertently discovered, and the incriminating nature was readily apparent. *Id.* Here, Detective Price's viewing of the vehicle from the outside while walking around it was lawful, he inadvertently discovered the casing resting on the seal, and its incriminating nature was readily apparent because there had been a nearby murder and the driver of the wrecked vehicle was a suspect in the shooting. As such, the elements of the plain view doctrine are met.

 Moreover, leaving the casing perched on the window casing while it was being towed was not a reasonable option. "Destruction of evidence is a recognized exigent circumstance creating an exception to the warrant requirement." *Commonwealth v. McManus*, 107 S.W.3d 175, 177

(Ky.2003). Where officers have probable cause to believe that a crime has occurred and that evidence from that crime is in imminent danger of being destroyed, it is reasonable for law enforcement officers to secure the place where the evidence is located in order to prevent its imminent destruction. *Id.* (citing *Segura v. United States,* 468 U.S. 796, 810, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (characterizing the preservation of evidence in danger of imminent destruction as a 'now or never' situation)). Detective Price knew of the nearby murder; knew the driver of the vehicle was a suspect; and, thus, had probable cause to believe the casing was connected to the crime. Further, exigent circumstances existed because the car was momentarily scheduled to be towed; and if the casing were left in its place, it could have easily fallen outside the vehicle while it was being moved. Thus, the circumstances were sufficiently exigent for Detective Price to have immediately seized the casing. Because of the casing's precarious perch near the vehicle's open window, Detective Price would have been subject to appropriate criticism had he not taken steps to secure it as evidence.

The trial court properly denied Hunt's motion to suppress the bullet casing.

## II. THE TRIAL COURT DID NOT COMMIT REVERSIBLE ERROR BY ADMITTING TESTIMONY REGARDING HUNT'S CLOTHING AND THE FORENSIC TESTS PERFORMED ON BLOOD FOUND ON THE CLOTHING.

Following the accident, Hunt was taken to the hospital where Detective Donald Parker collected Hunt's clothing and sealed it in a box. Later that evening, Parker delivered the clothing to the chief investigating officer, Detective Terry Thompson. Because it had been raining that evening and Hunt had wrecked his car in a creek, Detective Thompson was aware that Hunt's clothing was wet. He, therefore, opened the box in a secured wood shop at his residence and placed the clothing on a rack to dry. After the clothing had dried, Detective Thompson individually packaged each item and sent them to the laboratory for analysis. Testing disclosed that blood located in two places on Hunt's jacket matched Bettina's DNA profile.

Hunt argues that the clothing evidence and the related forensic testing were improperly admitted because there was a "fatal break in the chain of custody." He also alleges that because Detective Thompson had been to the murder scene and may have been exposed to Bettina's DNA, "there is a substantial possibility of cross-contamination of blood/DNA from the crime scene onto the Appellant's jacket." Hunt concedes this issue is not preserved. Nonetheless, in light of the death penalty imposed and pursuant to KRS 532.075(2), we review even unpreserved allegations of error. The standard of review for such unpreserved errors is:

> Assuming that the so-called error occurred, we begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, e.g., whether the failure might have been a legitimate trial tactic; and (2) if there is no reasonable explanation, whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed.

*Johnson v. Commonwealth,* 103 S.W.3d 687, 691 (Ky.2003) (citing *Sanders v. Commonwealth,* 801 S.W.2d 665, 668 (Ky. 1990)).

With items of physical evidence which are clearly identifiable and distinguishable, there is no requirement of proof of chain of custody. *Rabovsky v. Commonwealth*, 973 S.W.2d 6, 8 (Ky.1998). Although the jacket at issue here was clearly identifiable and distinguishable, the blood and DNA samples taken from it, which were the incriminating portion of the evidence, were not. Thus, proof of chain of custody was required. *See Id.* However,

> [e]ven with respect to substances which are not clearly identifiable or distinguishable, it is unnecessary to establish a perfect chain of custody or eliminate all possibility of tampering or misidentification, so long as there is persuasive evidence that the reasonable probability is that the evidence has not been altered in any material respect.... Gaps in the chain normally go to the weight of the evidence rather than to its admissibility.

*Id.* (citing *United States v. Cardenas*, 864 F.2d 1528, 1532 (10th Cir.1989); *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988)).

"The requirement of ... identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." KRE 901(a). "All possibility of tampering does not have to be negated. It is sufficient ... that the actions taken to preserve the integrity of the evidence are reasonable under the circumstances." *Thomas v. Commonwealth*, 153 S.W.3d 772, 778 (Ky.2004).

Hunt's argument that there were deficiencies in the chain of custody lacks specificity. There appears to be no dispute that Detective Parker collected the clothing evidence at the hospital, and gave it to Detective Thompson who, in turn sent it to the lab. There is no realistic possibility that someone could have broken into Detective Thompson's wood shop and planted Bettina's blood on it. As such, we believe the chain of custody itself was properly established.

In any event, rather than deficiencies in the chain of custody itself, Hunt's principal argument is that because Detective Thompson worked the crime scene, examined Bettina's body, and collected blood swab evidence, he may have unwittingly contaminated Hunt's clothing with blood from the crime scene. We are persuaded that Hunt's contention of accidental contamination is too speculative to create doubt about the integrity of the DNA evidence derived from the clothing and, to the contrary, that there is persuasive evidence that the evidence was not altered in any material respect.

At the time of the murder, Detective Thompson was a twenty-year veteran of the Kentucky State Police and had been a detective for approximately thirteen years. As such, it stands to reason that he had the training, skill, and experience to avoid the type of careless, accidental contamination of evidence suggested by Hunt. The avoidance of contamination is obviously a fundamental concern in evidence collection; and, beyond pure speculation, Hunt offers no facts in support of his theory that proper procedures were not followed to avoid contamination of the jacket. Under the standard suggested by Hunt, any time a detective works a bloody crime scene and later in the day comes into contact with evidence collected elsewhere, that evidence would be subject to possible exclusion based upon the mere possibility of contamination, however remote.

The theoretical possibility of contamination was a proper basis under which Hunt could have attacked, through cross-examination, the DNA evidence obtained from the clothing. However, he did not and so

a complete account of the precautions taken by Detective Thompson to avoid contamination is not available. We are persuaded, however, that a sufficient chain of custody of the clothing evidence was established at trial and that the speculative challenge now raised by Hunt goes to the weight that should have been given to the evidence by the jury, and not its admissibility. *Rabovsky*, 973 S.W.2d at 8.

In summary, we find no reversible error under this unpreserved argument.

### III. THE TRIAL COURT DID NOT ERR BY FAILING TO INSTRUCT THE JURY ON CRIMINAL TRESPASS AS A LESSER INCLUDED OFFENSE OF BURGLARY.

■ At the conclusion of the guilt phase of the trial, Hunt tendered an instruction on first-degree trespass as a lesser included offense to first-degree burglary. The trial court rejected the instruction as unsupported by the evidence. Hunt argues that the trial court's failure to give the instruction was reversible error.

■ "In a criminal case, it is the duty of the trial judge to prepare and give instructions on the whole law of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky.1999). However, the trial court has no duty to instruct on theories of the case that are not supported by the evidence. *Payne v. Commonwealth*, 656 S.W.2d 719, 721 (Ky.1983). An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense and, yet, believe beyond a reasonable doubt that he is guilty of the lesser offense. *Wombles v. Commonwealth*, 831 S.W.2d 172, 175 (Ky.1992).

First-degree burglary is defined in KRS 511.020(1) as follows:

(1) A person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:

(a) Is armed with explosives or a deadly weapon; or

(b) Causes physical injury to any person who is not a participant in the crime; or

(c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

First-degree criminal trespass is defined in KRS 511.060(1) as follows:

(1) A person is guilty of criminal trespass in the first degree when he knowingly enters or remains unlawfully in a dwelling.

Thus, first-degree criminal trespass differs from first-degree burglary, as relevant here, to the extent that the burglary statute requires "with intent to commit a crime" at the time the defendant enters or unlawfully remains in a building; whereas, the trespass statute does not.

Though the door knob of the carport door had been shot through, the door split from its frame, and Hunt was armed with a .357 Smith & Wesson and equipped with what may have been a makeshift silencer, he nevertheless argues that there is evidence showing he entered the residence without the intent of committing a crime. Hunt alleges the following evidence supports this theory: (1) there was a time lapse between the end of Bettina's phone

conversation with Karen Chaffins (when Hunt first came to the door) and the 911 call; (2) the evidence showed that Bettina may have been sitting in a chair when shot but could have left by another door if Hunt had been forcing his way in; (3) from the foregoing, it could be inferred that despite the damage to the door that Bettina decided to let Hunt in after the damage occurred and spoke with him at least a few minutes before the shooting; and (4) that the discussion, which would have been an emotional one about the destruction of their marriage, could have escalated and ultimately resulted in the shooting.

█ The trial court's decision not to give a jury instruction is reviewed for abuse of discretion. *Williams v. Commonwealth*, 178 S.W.3d 491, 498 (Ky.2005). In light of the overwhelming evidence that Hunt intended to commit a crime (if not to murder, then at least to harass, menace, or wantonly endanger Bettina) at the time he entered the residence, we must conclude that the trial court did not abuse its discretion in rejecting the proposed instruction.

Just forty minutes or so prior to the shooting, Hunt and Bettina had ended a heated telephone call during which she had told him she was going through with the divorce. Hunt arrived armed with a .357 revolver pistol and what appears to be a makeshift silencer, which strongly suggests that unlawful intent preceded his entry into the residence. Based upon the damage to the door, the only realistic inference is that Hunt entered the residence by force and without Bettina's permission. Further, Bettina's murder only moments after Hunt's entry strongly suggest his intent at the time of his entry into the residence.

Moreover, Bettina called 911 within two or three minutes of Hunt's initial arrival, and so Hunt's proposition that there was a conversation between the two following Hunt's entry which alone triggered his criminal intent, is unconvincing—the timeline does not fit. When the 911 tape recording begins, Hunt is fully engaged in the process of threatening Bettina as she pleads for her life. Again, this demonstrates that Hunt's theory is less than plausible.

Finally, we note that Hunt's defense was that an alternative perpetrator committed the crime. At no time did he affirmatively argue or present evidence that he lawfully entered the residence and formed the intent to engage in unlawful conduct only after his entry. In other words, his defense was that he was not present at all when Bettina was murdered. Accordingly, this is unlike the line of cases that hold that even if a defense theory is implausible, an instruction on the theory must be given. *See, e., Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky.1999).

Although we have cautioned that even implausible defense theories are entitled to instructions if there is an evidentiary basis for them, *id.*, we agree with the trial court that in this case, the evidentiary basis was lacking; and the court did not abuse its discretion in denying the instruction under the facts of this case.

## IV. THE TRIAL COURT DID NOT ERR BY FAILING TO QUASH THE SUPERSEDING INDICTMENT.

█ On December 9, 2004, the initial indictment was returned against Hunt charging him with murder and first-degree burglary. A superseding indictment was returned on June 28, 2005, adding the additional charge of first-degree wanton endangerment. The added charge addressed Hunt's conduct in endangering the life of Katrina by firing the several shots that killed Bettina while the infant lay in a bassinet in the same room.

Hunt filed a motion to quash the superseding indictment upon the assertion that the prosecutor sought the new indictment because Hunt rejected an offer made by the Commonwealth on May 12, 2005, to plead guilty to murder in exchange for a sentence of life without parole. At the motion hearing, the Commonwealth argued that the superseding indictment was necessary because, in effect, it had been neglectful by failing to bring the wanton endangerment charge before the original grand jury. After hearing arguments, the trial court denied the motion to quash.

Hunt argues that the reason offered by the Commonwealth (neglect in failing to originally seek the charge) was an insufficient reason to support seeking the superseding indictment; and, therefore, there should be a presumption that the second indictment was sought for vindictive reasons.

However, as pointed out in *Commonwealth v. Leap*, 179 S.W.3d 809 (Ky.2005), a presumption of prosecutorial vindictiveness has been limited to those cases in which a defendant has been subjected to additional charges or an enhanced sentence following a successful attack upon a conviction and has not been extended to pretrial prosecutorial conduct. *Id.* at 813. Indeed, we examined the possibility of such an extension in *Leap*, and concluded "we are not disposed to extend the presumption of 'prosecutorial vindictiveness[ ]' . . . to the pretrial setting." *Id.* at 814 (citations omitted). Because the prosecutorial conduct complained of by Hunt occurred in a pretrial setting, the presumption of vindictiveness doctrine is inapplicable.

Nor may a claim of actual vindictiveness succeed. No due process violation occurred even if the Commonwealth had actually decided to bring the charge to "retaliate" against Hunt for turning down its plea offer. In *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), the United States Supreme Court held that it is not a violation of due process when a prosecutor actually carries out a threat made during plea negotiations to have the accused re-indicted on more serious charges on which he is plainly subject to prosecution if he does not·plead guilty to the offense with which he was originally charged. *Leap*, 179 S.W.3d at 813.[5] "The prosecution has an obligation to the Commonwealth to properly charge and convict persons guilty of criminal conduct as defined in our Kentucky Statutes." *Id.* at 814. The first indictment failed to consider that the infant Katrina, too, was a victim of Hunt's conduct; and the superseding indictment appropriately addressed this initial oversight.

## V. THE PROSECUTOR DID NOT MISSTATE THE LAW APPLICABLE TO EXTREME EMOTIONAL DISTURBANCE IN HIS CLOSING ARGUMENT.

Hunt contends that prejudicial error occurred as a result of statements made by the prosecutor during closing argument addressing Extreme Emotional Disturbance (EED) and whether there was an evidentiary basis for a finding of EED in the present case. In support of his argument, Hunt directs us to the following statements made by the prosecutor in his closing argument:

5. We are unpersuaded that the fact that the prosecutor's failure to actually threaten Hunt with the additional charge appreciably distinguishes this case from *Bordenkircher.* Moreover, we note that the Commonwealth left open its original offer up until the date of the trial and invited Hunt to make a counteroffer.

There hasn't been much talk about EED. But I wanted to go over it with you because it's in the instructions.... [I]t's an element of murder that he was not acting under the influence of extreme emotional disturbance. So because this is such a significant element there is a legal definition for it.... Extreme emotional disturbance is a temporary state of mind so enraged, inflamed or disturbed as to overcome one's judgment and to cause one to act uncontrollably from the impelling force rather than from evil or malicious purposes.... [T]hat in no way describes what the defendant did here ... it was premeditated.

That he concocted this juice bottle silencer thing and brought it with him, that he had to be outside the door for some period of time before he got in. Listen to the 911 tape again. You don't hear the defendant on there screaming in rage, out of control and overcome by the, acting uncontrollably from the impelling force of the extreme emotional disturbance. Look at what the witnesses said who saw him after he wrecked, only minutes after she was killed. They didn't describe a guy that was in a big rage and out of his head and acting irrationally. They said he was quiet and calm and didn't have a whole lot to say. Look at what he did. He hid the gun over in the creek. He lied to the police about where he had been and what had happened. Are those the acts of someone who's under some big temporary enraged, inflamed, disturbed state of mind that would be described an extreme emotional disturbance? Of course it's not.

And the reason it's important is when you turn over to the next instruction for murder, and what you see is there is a lower degree charge that you can also find him guilty of instead of murder called first-degree manslaughter. If you read it you'll see that it is pretty much the same as murder except when you get down to this one part about extreme emotional disturbance whereas with murder you have to find he was not acting under extreme emotional disturbance. For first-degree manslaughter you'd have to find that he was acting under the influence of extreme emotional disturbance. So if you get to there the effect of that is to lessen the charge to something less than murder.

I would ask you, look at the evidence, listen to the 911 tape again and ask yourself is this something less than murder, or is it murder. And I believe what you'll see is that it is murder. There's no extreme emotional disturbance here. There has been absolutely no evidence of that.

Hunt argues that the prosecutor misstated the law "by implying EED has to apply to an 'instantaneous' situation; that there is a time limit." Hunt supports his argument by citing to cases that, for example, indicate that EED may result from the "cumulative impact of a series of related events," *Holland v. Commonwealth*, 114 S.W.3d 792, 807 (Ky.2003), and that the triggering event need not immediately precede the commission of the offense, *Fields v. Commonwealth*, 44 S.W.3d 355, 359 (Ky.2001).

However, an examination of the passage cited by Hunt discloses that the prosecutor did not state that EED must be "instantaneous." Nor did he state that EED could not be brought about gradually or that the triggering event must immediately precede the commission of the offense. Upon the whole, there is a complete disconnect between what the prosecutor said and Hunt's characterization of it.

We recently summarized the definition and elements of EED in *Greene v. Commonwealth*, 197 S.W.3d 76 (Ky.2006) as follows:

> Although EED is essentially a restructuring of the old common law concept of "heat of passion," the evidence needed to prove EED is different. There must be evidence that the defendant suffered "a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from [an] impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *McClellan v. Commonwealth*, 715 S.W.2d 464, 468–69 (Ky.1986). "[T]he event which triggers the explosion of violence on the part of the criminal defendant must be sudden and uninterrupted. It is not a mental disease or illness.... Thus, it is wholly insufficient for the accused defendant to claim the defense of extreme emotional disturbance based on a gradual victimization from his or her environment, unless the additional proof of a triggering event is sufficiently shown." *Foster v. Commonwealth*, 827 S.W.2d 670, 678 (Ky.1991) (citations omitted). And the "extreme emotional disturbance ... [must have a] reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." [*Spears v. Commonwealth*, 30 S.W.3d 152, 155 (Ky.2000) ].

*Id.* at 81–82.

A comparison of the excerpt from *Greene* with the comments made by the prosecutor in closing arguments discloses that there was no misstatement of the law. It follows that no error occurred.

## VI. NO ERROR OCCURRED AS A RESULT OF DETECTIVE THOMPSON'S CHARACTERIZATION OF THE JUICE BOTTLE AS A SILENCER

During his direct testimony for the Commonwealth, Detective Thompson stated that while examining the crime scene he discovered a plastic juice bottle on the kitchen table. As described by Detective Thompson, the bottom of the bottle was cut out and part of a t-shirt stuffed inside. Further, there was duct tape attached to the mouth of the bottle. Detective Thompson was asked what the bottle looked like, and he replied "a silencer." Hunt did not timely object to the testimony or request an admonition to deal with the statement; accordingly, the issue is not properly preserved.

A review of the exchange discloses that it was not the Commonwealth's intent to portray Detective Thompson as a firearms expert and establish that the bottle was, in fact, a silencer. The Commonwealth did not attempt to lay a foundation to qualify him as a firearms expert. Indeed, at a later bench conference, when Hunt first voiced objection to the characterization, the Commonwealth stated it was not its intention to elicit the characterization at all, but, rather, the comment was spontaneously made by the officer. As such, Detective Thompson was not testifying in the capacity of an expert witness when he made the utterance; rather he was testifying as a lay witness.

Because of Hunt's lack of a timely objection, the trial court was not given an opportunity to rule on the admissibility of Detective Thompson's characterization of the bottle. However, in the context the statement was made, we conclude the testimony would have been admissible as proper lay witness testimony.

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is nevertheless admissible as long as it is limited to those opinions or inferences which are: (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized[6] knowledge within the scope of expert testimony. KRE 701. "The degree to which a witness may give an opinion, of course, is predicated in part upon whether and the extent to which the witness has sufficient life experiences that would permit making a judgment as to the matter involved." *Mondie v. Commonwealth,* 158 S.W.3d 203, 212 (Ky.2005).

The altered juice bottle was discovered at a murder scene involving the use of a firearm. In this context, we believe Detective Thompson, an experienced police officer with corresponding life experiences, properly stated his lay opinion that the bottle "looked" like a silencer (he did not testify that it *was* a silencer). Further, given the notable lack of any other reasonable explanation for the contrivance, it is a reasonable inference that the anticipated use of the bottle was to place the barrel of the murder weapon into the mouth of the bottle, duct tape it on, and have the t-shirt and hollow of the bottle act as a make-shift silencer.[7] We, accordingly, believe the evidence was admissible under KRE 701.

In any event, even if admission of the statement was error, we do not believe that it prejudiced Hunt's substantial rights under RCr 9.24. There was an overwhelming amount of evidence to tie him to the murder, including DNA evidence and the murder weapon. Thus, we can say that even if this was error, the judgment would not have been "substantially swayed" by it. *Winstead v. Commonwealth,* 283 S.W.3d 678, 689 (Ky.2006) (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

## VII. NO IMPROPER COMMENT ON HUNT'S FIFTH AMENDMENT RIGHT TO REMAIN SILENT OCCURRED.

Hunt contends that in three respects, his Fifth Amendment right to remain silent was violated: (1) in the Commonwealth's opening statement when the prosecutor commented on Hunt's failure to give an explanation for being in the vicinity at the time the murder was committed, and his failure to take responsibility for the crime; (2) when Detective Thompson testified that he attempted to interview Hunt the night of the murder, and Hunt "declined to make a statement"; and (3) in the Commonwealth's closing argument in the penalty phase when the prosecutor referred on several occasions to Hunt's failure to show remorse for his crimes. Hunt concedes that this issue is not preserved.

The Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody. *See, e.g., Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Ro-*

---

**6.** While perhaps not widely known among the general public, homemade silencers devised from bottles are not unheard of. *See, e.g., Simpson v. Commonwealth,* No.2007–SC–000253–MR, 2009 WL 1830803 (Ky. Jun 25, 2009) (2–liter Mountain Dew bottle duct-taped to the end of pistol to make a homemade silencer).

**7.** It is undisputed that the bottle was not actually employed as a silencer in the shooting. The evidence was that no bullets were fired through it.

*mans v. Commonwealth,* 547 S.W.2d 128, 130 (Ky.1977). In *Romans,* we held that it was error to permit the Commonwealth to elicit from a police detective that at the time of arrest and interrogation, and after receiving *Miranda* warnings, the defendant "did not come forth with the explanation ... upon which he ultimately relied for his defense." 547 S.W.2d at 130; *see also Miranda v. Arizona,* 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The idea is that because *Miranda* warnings implicitly assure their recipient that his silence will not be used against him, it would be fundamentally unfair to allow a defendant's post-*Miranda* silence to be used for impeachment. However,

> it is clear that not every isolated instance referring to post-arrest silence will be reversible error. It is only reversible error where post-arrest silence is deliberately used to impeach an explanation subsequently offered at trial or where there is a similar reason to believe the defendant has been prejudiced by reference to the exercise of his constitutional right. The usual situation where reversal occurs is where the prosecutor has repeated and emphasized post-arrest silence as a prosecutorial tool.

*Wallen v. Commonwealth,* 657 S.W.2d 232, 233 (Ky.1983).

In context, the closing argument statement comments Hunt objects to are as follows:

> and in spite of all this overwhelming evidence, the defendant, when he was interviewed by the police that night, he claims to not know anything about it. In fact, I think what he told one of the officers when they first got there is that he was, the reason he was there, because he didn't live there, and had no reason to be in Buck's Branch, was that he had been coming from Food City in

Prestonsburg and had gone through Spurlock that way, and that's why he just happened to be there exactly the moment she was murdered. And you will hear police officers—*that that is as close as he gave to giving any kind of explanation. So he up to this point has refused to take responsibility for this.* After all the evidence is in, and after you have had an opportunity to consider all of it, we are going to ask you to make him take responsibility for what he did. And hold him accountable. Find him guilty of the murder of Bettina Hunt....

(Emphasis added).

An examination of the emphasized text above discloses that the prosecutor came nowhere near making a direct comment on any invocation by Hunt of his right to remain silent (which, it is to be supposed) explains the lack of an objection. In context, the comments of the prosecutor obviously refer to the implausibility of Hunt's story that he was in the vicinity of the murder because he was returning from the grocery (no groceries were found in the vehicle) and that Hunt concocted the story to mislead the police into believing he was not responsible for the crime. In sum, the complained of statements were not in reference to Hunt's right to remain silent and were not otherwise improper.

■■■■ The second incident complained of occurred during Detective Thompson's testimony. During his testimony, Detective Thompson was asked if he attempted to interview Hunt twice the evening of the murder. Detective Thompson stated that he did attempt to interview Hunt a second time, but that Hunt "declined to make any statement." In context, again, we are persuaded that there was no impermissible comment on Hunt's right to remain silent.

Hunt was first arrested and Mirandized at the accident scene. At that time, he told Detective Brian Layne that he was in the area because he was returning home from the grocery and was run off the road by a red vehicle; he also at this time denied knowledge of the nearby murder. Later, at the hospital, Detective Thompson informed Hunt that his wife had been murdered. Hunt briefly covered his eyes and asked him who had killed her. Hunt also stated that he did not know anything about the murder and could not remember anything before the accident. Hunt had already given these statements to the police before the comment that he declined to make any statement. Thus, in context, the question and response at issue was an explanation of the fact that Hunt had not added to, or subtracted from, his prior statements. This was proper. *See, e.g., U.S. v. Crowder,* 719 F.2d 166 (6th Cir. 1983) (explaining that testimony that defendant told FBI agent he did not desire to discuss matter for which he was arrested and that he chose to stand by his statement to state police did not violate his Fifth Amendment right to remain silent and, thus, was admissible because he never exercised his Fifth Amendment right to remain silent as he was advised he had right to do).

In any event, even if Detective Thompson's statement could be construed as an improper comment on Hunt's right to remain silent, nevertheless, this would amount to no more than a fleeting comment in a two-week trial. It was not repeated, emphasized, or used as a prosecutorial tool. As such, we are not persuaded that the single reference to Hunt's invoking his right to remain silent resulted in palpable error.

■ Hunt's final argument relating to improper comment on his Fifth Amendment rights involves various comments made by the prosecutor during his closing arguments during the penalty phase of the trial in which Hunt's "lack of remorse was referred to." More specifically, Hunt refers us to the following statements:

(1) Hunt had a "total and complete lack of remorse or regret over anything that occurred."

(2) "Has anybody seen any remorse from this defendant during the trial?"

(3) "He's seen photos of the scene with his wife's body lying there in a pool of blood, who his family says he loved and got along with.... He's listened to this chilling 911 tape with his wife crying and pleading for her life and being shot.... He's listened to Bettina Hunt's family and friends get up, have been devastated by what he did.... That's my question, has anybody even detected even a hint of remorse. I haven't."

4. "The only remorse this defendant has in this entire thing is that he got caught, plain and simple."

5. "In the face of all this harm that he's caused, in the face of all of the evidence that you have seen, he has come here expecting you to ignore all of that and give him a break."

6. Hunt "thought he could get away with it when he did it and I would submit to you that even as we stand here today he is trying to get away with it by avoiding a just sentence for what he did."

■ Again, we do not construe these statements as commentary upon Hunt's right to remain silent.[8] The last three statements do not even remotely relate to

8. Hunt does not argue error premised upon the prosecutor's comment upon his "lack of remorse" alone.

the invocation of the right. Further, only by an exaggerated inference could the first three statements be stretched to refer to the right; that is, that Hunt failed to take the stand and express remorse. Rather than a comment on Hunt's silence, we construe the statements as relating to his courtroom demeanor. A prosecutor is entitled to comment on the courtroom demeanor of a defendant. *Woodall v. Commonwealth*, 63 S.W.3d 104, 125 (Ky.2001). We find no error in the comments cited.

## VIII. HUNT WAS NOT ENTITLED TO A DIRECTED VERDICT ON THE WANTON ENDANGERMENT CHARGE.

Hunt contends that he was entitled to a directed verdict upon the charge of first-degree wanton endangerment. He argues that the evidence demonstrated that Katrina was not in the line of fire and was never in danger.

 On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. *Id.* For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true but reserving to the jury questions as to the credibility and weight to be given to such testimony. *Id.* "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.* (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky.1983)). "[T]here must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Benham,* 816 S.W.2d at 186–87.

KRS 508.060 provides that "[a] person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person."

 As previously discussed, the infant Katrina was in a bassinet in the room where the murder occurred. Her bassinet was next to the chair that Hunt theorizes Bettina was near at the time of the first shot. Two bullets were located in the vicinity of the chair—one underneath the chair embedded in the carpet padding and the other lying next to the chair. It follows that the bullets flew within a matter of feet of Katrina. At least three or four bullets were fired during the course of the murder. It is self-evident that bullets may ricochet. Further, Hunt was intoxicated while firing the pistol.

Viewing the evidence in the light most favorable to the Commonwealth and giving it the benefit of all reasonable inferences, the conduct engaged in by Hunt easily meets the standard for a conviction for first-degree wanton endangerment. *See Key v. Commonwealth*, 840 S.W.2d 827 (Ky.App.1992). (holding that the pointing of a gun, whether loaded or unloaded, at any person constitutes conduct that creates a substantial danger of death or serious physical injury to another person in violation of KRS 508.060 provided there is reason to believe the gun is loaded, and where the wanton conduct also includes shooting the gun near the victims, either conduct independent of each other is sufficient to meet the requirements of the statute).

## IX. HUNT'S TELEPHONE BILL WAS PROPERLY EXCLUDED.

During the months preceding the murder, Hunt had a cellular telephone through Cingular. Hunt's daughter, Kay Miller, received the bill electronically on her computer and made the monthly payment. Hunt sought to introduce the bill for the November 2004 time period through Miller's trial testimony in order to show that Hunt and Bettina talked frequently by phone, sometimes at great length, to demonstrate that the couple, by inference, had a congenial relationship. The Commonwealth objected upon the grounds of failure to establish a proper foundation, and the trial court sustained the objection. Hunt alleges the trial court's ruling was error because it deprived him of his right to present a defense.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE 901(a). For purposes of authentication, the condition of fact which must be fulfilled by every offer of real proof is whether the evidence is what its proponent claims. *Johnson v. Commonwealth,* 134 S.W.3d 563, 566 (Ky.2004). Part of the identification of evidence is a demonstration of its integrity—that it is in fact what its proponent claims it to be. *Rogers v. Commonwealth,* 992 S.W.2d 183, 187 (Ky.1999).

Hunt attempted to introduce the telephone billing records for the truth of the matter contained therein; and, thus, the records must clear the hurdle for the admission of hearsay evidence. KRE 803(6) addresses the admissibility of business records under the hearsay rules. The rule states, as relevant here, as follows:

> The following are not excluded by the hearsay rules, even though the declarant is available as a witness:
>
> . . . .
>
> (6) Records of regularly conducted activity. A ... record, or data compilation, in any form, of acts, events, [or] conditions, ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, *all as shown by the testimony of the custodian or other qualified witness,* unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness . . . .

Similarly, Professor Robert G. Lawson discusses the issue as follows:

> Business records are writings. Writings must be authenticated, i.e., accompanied by preliminary evidence sufficient to support a finding that they are what their proponents claim. This preliminary proof is commonly referred to as 'foundation.' KRE 803(6) requires 'testimony of the custodian or other qualified witness' concerning the prerequisites for admitting business records.... [I]t is 'essential' testimony without which business records 'must be excluded.'
>
> It is also well-settled that the foundation witness need not be the custodian of the records nor the person who made them. Anyone who can testify from personal knowledge about the circumstances surrounding the making and keeping of the records can qualify as a foundation witness. As stated by one authority, 'in the end the requirement may be satisfied by the testimony of anyone who is familiar with the manner in which the record was

prepared, and even if he did not himself either prepare the record or even observe its preparation.'

THE KENTUCKY EVIDENCE LAW HANDBOOK § 8.65 at 463 (3d ed. 1993).

Here, Hunt did not introduce the bill through the testimony of the custodian of Cingular's telephone bill, nor was Miller an "other qualified witness." Miller had no personal knowledge of how Cingular prepared the bill, its billing procedures, or any other competent knowledge which would allow her to testify to the verity of the content of the bill. While she was generally aware that Hunt and Bettina talked frequently on the phone, she had no knowledge of specific calls or the length thereof. Nor were the self-authentication provisions of KRE 902(11) followed.

Because the bill was not properly authenticated, the trial court did not abuse its discretion by excluding it.[9]

### X. THE PHOTOGRAPHIC EVIDENCE WAS PROPERLY ADMITTED.

During the testimony of Katrina's mother, Veronica Harris, various circumstances relating to Katrina's premature birth, health, special needs, and custody arrangements were discussed. In connection with the testimony, a picture of Katrina was introduced. The picture was taken in the hospital and showed her hooked up to monitoring devices. Because of the health problems related to her premature birth, Katrina was required to be on the devices after her release from the hospital, though not the same ones seen in the photograph. Hunt contends that the picture should have been excluded because "the emotion evoking nature of the photo made it more prejudicial than probative."

The Commonwealth is not permitted to introduce evidence which serves little or no legitimate evidentiary purpose other than to engender sympathy for the victim and his or her family. See, e.g., Ice v. Commonwealth, 667 S.W.2d 671, 676 (Ky.1984). In interpreting this general prohibition, we have explained a "victim can be identified as more than a naked statistic[.]" Bowling v. Commonwealth, 942 S.W.2d 293, 302 (Ky.1997). Katrina was the victim of the first-degree wanton endangerment charge. Her fragile state of health, as depicted in the photograph, was relevant to the charge of wanton endangerment. She was absent from the courtroom, and the photograph assisted in the identification of her as something more than an anonymous victim. The trial court did not abuse its discretion by permitting the photograph to be introduced.

Hunt also claims that it was error to introduce, over his objection, the autopsy photographs of Bettina. The autopsy photographs depicted the wounds inflicted by Hunt. Hunt alleges that the introduction of the photographs was unnecessary because there was no challenge to the testimony that Bettina was shot or the medical examiner's testimony about her wounds, and the location of the wounds could have been established by the use of a diagram.

In determining admissibility of the photographs, we must first consider whether the photos are relevant. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

---

9. We further note that extensive testimony was presented at trial that Hunt and Bettina talked frequently, and often at length, on the telephone. Thus the point was made without admission of the bill.

KRE 401. The autopsy photographs of Bettina's fatal injuries were relevant to demonstrate that Bettina was, indeed, killed by gunshot wounds as stated in the indictment. Hunt argues that the wounds could have been demonstrated by diagrams illustrating where the bullets entered and exited. However, the photographs were the best evidence to show the location of the wounds and demonstrate to the jury that Bettina was killed by gunshot injuries.

■ Next, the admissibility of photos must be examined under KRE 403, which states: "Although relevant, evidence may be excluded if its probative value is *substantially outweighed* by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403 (emphasis added). More specifically, we must discern whether the photographs were sufficiently gruesome so as to find the probative value "substantially outweighed" by the prejudicial effect. As a general rule, photographs do not become inadmissible simply because they are gruesome. *Foley v. Commonwealth*, 953 S.W.2d 924, 936 (Ky.1997). Such evidence loses its admissibility when the photographs begin to depict a body that has been "materially altered by mutilation, autopsy, decomposition or other extraneous causes, not related to commission of the crime, so that the pictures tend to arouse passion and appall the viewer." *Clark v. Commonwealth*, 833 S.W.2d 793, 794 (Ky. 1991). We agree with Hunt that the autopsy photographs were gruesome; however, the threshold is much higher than mere gruesomeness for a photo to be inadmissible. For example, a photograph of a young child victim, where his scalp was pulled back to show there was an intent to kill, was not gruesome enough to preclude

the photo evidence from the jury. *Quarels v. Commonwealth*, 142 S.W.3d 73 (Ky. 2004). In another case, a videotape of the murder scene showing burned bodies of victims, as well as numerous photographs depicting the same were an accurate description of the crime scene and were properly admissible. *McKinney v. Commonwealth*, 60 S.W.3d 499 (Ky.2001). The autopsy photographs were properly admitted because they depicted Bettina's injuries accurately and were not so gruesome so as to preclude the photograph from evidence. There is no error here.

## XI. NO ERROR OCCURRED DURING VOIR DIRE AND JURY SELECTION.

Hunt alleges a wide array of errors occurred during voir dire and the jury selection process. These errors break down into three groups: questioning jurors on whether they could sign a death sentence verdict, jurors who should have been excused but were not, and jurors who were improperly excused. We address the alleged errors under these subheadings.

### A. Voir dire questioning about serving as foreperson.

■ During voir dire, various prospective jurors were asked by the prosecutor if he or she could sign the jury verdict form if selected as foreperson and the death penalty were imposed. Hunt cites us to thirteen instances where this question was asked. Various responses were given. Three of the thirteen members who were asked the question served on the jury. Hunt argues that it is prejudicial to permit the Commonwealth to use such questioning to gauge jurors' views on the death penalty and then use the views espoused to obtain a hyper-death qualified jury. He states the Commonwealth is not entitled to excuse those who could not serve as fore-

person and sign the death verdict. Hunt concedes that this issue is not preserved.

Again, we review unpreserved allegations of error in death penalty cases under the standard established in *Cosby v. Commonwealth*, 776 S.W.2d 367 (Ky.1989) (*overruled on other grounds by St. Clair v. Roark*, 10 S.W.3d 482, 487 (Ky.1999)), and *Sanders v. Commonwealth*, 801 S.W.2d 665 (Ky.1990), that is,

> (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, e.g., whether the failure might have been a legitimate trial tactic; and (2) if there is no reasonable explanation, whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed.

*Id.* at 668.

We first note that there is no allegation that any juror was actually excused for cause based upon his or her answer to the jury foreperson question, be it whether they would or would not have a problem with signing a death sentence verdict. Further it could just as easily be said that the question was equally instructive to the defense in evaluating the leanings of an individual juror and, thus, whether its strategy should be to keep or exclude the juror. Thus, even if asking the question was error, it is difficult to identify any prejudice as a result of it being asked. It follows that absent the asking of the question there is not a reasonable possibility that the verdict or sentence would have been different.

In any event, the Ohio Supreme Court recently addressed this same issue in *State v. Davis*, 116 Ohio St.3d 404, 880 N.E.2d 31 (2008). It answered the question as follows:

Such questioning was proper because the relevant inquiry during voir dire in a capital case is whether the juror's beliefs would prevent or substantially impair his or her performance of duties as a juror in accordance with the instructions and the oath. *Wainwright v. Witt*, 469 U.S. at 424, 105 S.Ct. 844, 83 L.Ed.2d 841. "Clearly, a juror who is incapable of signing a death verdict demonstrates substantial impairment in his ability to fulfill his duties." *State v. Franklin*, 97 Ohio St.3d 1, 2002–Ohio–5304, 776 N.E.2d 26, 34 (Ohio 2002).

We believe the rule, as stated in *State v. Davis* is sound; and, accordingly, no error occurred in questioning jurors upon the issue of whether he or she could sign a death penalty verdict. Moreover, it is absolutely necessary that in all criminal cases, both capital and non-capital, that someone signs the jury verdict as foreperson. It is, therefore, reasonable for either party to inquire of the prospective jurors to determine if any have a conscientious objection to performing that function, lest the court seat a jury that will not return a proper verdict.

### B. Jurors who should have been excused for cause.

"In Kentucky, the right to an impartial jury is protected by Section 11 of the Kentucky Constitution, as well as the Sixth and Fourteenth Amendments to the [United States] Constitution." *Fugett v. Commonwealth*, 250 S.W.3d 604, 612 (Ky.2008); *see also Fugate v. Commonwealth*, 993 S.W.2d 931, 939 (Ky.1999). "RCr 9.36(1) provides that the trial judge shall excuse a juror [for cause] when there is reasonable ground to believe that the prospective juror cannot render a fair and impartial verdict." *Smith v. Commonwealth*, 734 S.W.2d 437, 444 (Ky.1987) (*quoting Peters*

v. *Commonwealth*, 505 S.W.2d 764, 765 (Ky.1974)).

 We have:

long recognized that 'a determination as to whether to exclude a juror for cause lies within the sound discretion of the trial court, and unless the action of the trial court is an abuse of discretion or is clearly erroneous, an appellate court will not reverse the trial court's determination.'

*Fugett*, 250 S.W.3d at 613 (quoting *Pendleton v. Commonwealth*, 83 S.W.3d 522, 527 (Ky.2002)); *see also Soto v. Commonwealth*, 139 S.W.3d 827, 848 (Ky.2004). That determination, however, "is based on the totality of the circumstances ... [and] not on a response to any one question." *Fugett*, 250 S.W.3d at 613. This must be so where "the duty of the trial court" is to " 'evaluate the answers of the prospective jurors in context and in light of the juror's knowledge of the facts and understanding of the law.' " *Id.* (quoting *Stopher v. Commonwealth*, 57 S.W.3d 787, 796 (Ky.2001)).

 If an abuse of discretion is found in failing to strike a juror for cause, the trial court will not be reversed unless "the party had to use a peremptory challenge to strike the juror and, in fact, used all his peremptory challenges." *Fugett*, 250 S.W.3d at 613 (citing *Stopher*, 57 S.W.3d at 796). We have held that this requirement exhausting one's peremptory challenges "is predicated on the idea that peremptory strikes are a substantial right given to the defendant" because, "if the defendant had to use all of his peremptory strikes to remove a juror that should have been stricken for cause, a juror that he otherwise would have stricken would have been impaneled on the jury." *King v. Commonwealth*, 276 S.W.3d 270, 279 (Ky.2009)

(citing *Shane v. Commonwealth*, 243 S.W.3d 336, 341 (Ky.2007)). For this reason, "the jury could never be completely fair to the defendant since he was not able to effectively exercise his right to choose jurors." *Id.*

 The established "test for determining whether a juror should be stricken for cause is 'whether ... the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict.' " *Thompson v. Commonwealth*, 147 S.W.3d 22, 51 (Ky. 2004) (quoting *Mabe v. Commonwealth*, 884 S.W.2d 668, 671 (Ky.1994)). "[T]he party alleging bias bears the burden of proving that bias and the resulting prejudice." *Cook v. Commonwealth*, 129 S.W.3d 351, 357 (Ky.2004) (citing *Caldwell v. Commonwealth*, 634 S.W.2d 405, 407 (Ky.1982)). Where there is such a showing, "[t]he court must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor." *Shane*, 243 S.W.3d at 338; *Walker v. Commonwealth*, 288 S.W.3d 729, 736–37 (Ky. 2009).

Hunt contends that the trial court erred by failing to sustain his challenge to remove Juror 87 [10] and Juror 60 for cause because they expressed an inability to consider mitigating evidence. "In promulgating KRS 532.025(2) the legislators of Kentucky recognized the dire necessity of having jurors consider mitigating circumstances when the death penalty might be imposed." *Smith v. Commonwealth*, 845 S.W.2d 534, 539 (Ky.1993).

 Hunt alleges that Juror 87 expressed an inability to consider Hunt's prior record and emotional state as mitigating circumstances. However, in both instances, when initially asked the question of

---

**10.** We note that Hunt erroneously referred to this juror in his brief as Juror 84. The record

discloses that the Juror referred to was actually Juror 87.

whether he could consider these factors, Juror 87 responded "yes." Defense counsel then followed up with the question "would it make any difference to you?"; and the juror responded "No." Accordingly, his answers were ambiguous. Juror 87 otherwise stated that he could consider mitigating evidence and could impose the minimum twenty-year sentence on the murder charge. The trial court did not abuse its discretion in denying the challenge.

Hunt contends that the trial court erred in denying his challenge to Juror 60 because he expressed that a person's life history should not be considered in mitigation and that he would not so consider it even if instructed by the court to do so. A review of the video transcript, however, again demonstrates that the question and juror's response were ambiguous and that the juror did not flatly state that a person's life history should not be considered in mitigation. On the other hand, Juror 60 testified that he could consider "anything to do with the case," and that he could consider the full range of penalties. The trial court did not abuse its discretion in denying the challenge.

Hunt next contends that the trial court erred by failing to excuse Juror 39 and Juror 42 for cause on the basis that they both expressed that they would be biased against a defendant who did not testify.

In voir dire questioning, Juror 39 was asked if he could think of a situation in which he would require a defendant to put on evidence; and he responded to the effect that if the defendant was innocent, he would think he would present a defense. Upon follow-up questioning, however, the juror acknowledged that he would not hold it against a defendant if he did not testify at trial. When asked about a defendant not putting on evidence, the juror stated that "it would be their choice," although he

personally would if he could. He also stated that it would be "easier" if a defendant put on evidence if he had any but that he would understand why a defendant may not put on a defense. The juror also stated that he would follow the trial court's instructions. Upon examination of the voir dire as a whole, Juror 39 did not express that he would hold it against a defendant if he did not testify and present evidence. In fact, to the contrary, he expressed that he would not hold it against the defendant. The trial court did not abuse its discretion by denying Hunt's challenge to Juror 39.

During his voir dire questioning, Juror 22 was asked if the defendant did not put on evidence, would that tend to make him think the defendant might be guilty. Juror 22 responded "it would put a thought in my mind anyway, as to why he would not try to defend himself." After the trial court explained the concepts of presumption of innocence and burden of proof, however, the juror stated that he would follow the trial court's instructions and place the burden of proof on the Commonwealth. Despite the juror's initial statement, once set straight on the basic principles at issue, he committed himself to not holding the failure of a defendant to put on evidence against him.

Hunt also challenges Juror 22 on the grounds that the juror "said he could be fair but not impartial because he had read or heard about the case." A review of the voir dire, however, discloses that the juror had merely remembered hearing about the case and reading about it in the newspaper. He stated that he had not formed an opinion about the case; that if he were on the jury, he would be fair and impartial; and that he could put aside anything he had read and would follow the court's instructions. Mere exposure to pretrial publicity does not automat-

ically disqualify a prospective juror. *Maxie v. Commonwealth*, 82 S.W.3d 860, 862 (Ky.2002). The trial court did not abuse its discretion by failing to strike Juror 22 for cause based upon his voir dire answers.

### C. Jurors Alleged to be Improperly Excused.

Hunt contends that three jurors were excused for cause because they expressed that they could not impose the death penalty when, actually, they had only imposed hesitancy to impose the penalty and, accordingly, should not have been excused. The three jurors were Juror 96, Juror 42, and Juror 24.

▆ The leading United States Supreme Court cases on "death qualification," i.e., *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); and *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), address the circumstances under which a potential juror may be excused for cause because of the juror's bias against imposition of the death penalty. *Witherspoon* held that strikes for cause could not be employed to empanel a jury predisposed to return a verdict of death, 391 U.S. at 521–23, 88 S.Ct. 1770; and that "[u]nless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal," *id.* at 515 n. 9, 88 S.Ct. 1770, it cannot be assumed that such is that person's position simply because the juror expressed reservations or scruples about the death penalty. *Id.* Although *Witherspoon* also states "[t]hat the most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law," *id.* at 522

n. 21, 88 S.Ct. 1770, *Adams, supra*, explained that "*Witherspoon* is not a ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude." 448 U.S. at 47–48, 100 S.Ct. 2521. "[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Witt*, 469 U.S. at 424, 105 S.Ct. 844 (quoting *Adams*, 448 U.S. at 45, 100 S.Ct. 2521). If so, the removal of so-called " 'Witherspoon-excludables' serves the State's entirely proper interest in obtaining a single jury that could impartially decide all the issues in [a death penalty] case." *McCree*, 476 U.S. at 180, 106 S.Ct. 1758; *Caudill v. Commonwealth*, 120 S.W.3d 635, 654 (Ky.2003).

▆ During his voir dire questioning, Juror 96 stated on several occasions unequivocally that he could not give the death penalty. Under questioning by defense counsel, the hypothetical was posed that if he were on the jury and the judge ordered him to consider the death penalty, would he; and the juror responded that he would consider it but would not vote for it. However, under further questioning, he again stated he could consider it. Because of the inconsistency, the trial court followed up with a question again asking the juror if he could impose the death penalty and he stated that he could not. In light of Juror 96's plainly expressed firm conviction against the death penalty, the trial court did not abuse its discretion by striking him for cause.

▆ During her voir dire questioning, Juror 42, when asked if she would have problems voting for any of the possible punishments, responded "I don't know about death." When asked if she could impose the death penalty under any cir-

cumstance she responded "I don't know, I don't know" and "I would struggle with death" and "I don't think I could." Under further questioning, she responded "I don't think I could do death ... I just don't think I could," and again "I just don't think I could." Under later questioning she again stated that she would have a problem considering death; and she would "really struggle" if required to consider death. Nevertheless, Hunt points to Juror 42's response to the hypothetical question of what would she do if she were on the jury and the trial court ordered her to consider the death penalty. The juror responded "well if I am in that room, I am going to have to." Though her response to the hypothetical question could be interpreted as a willingness to give proper consideration to the death penalty, in light of the overall tone and tenor of her other answers expressing severe difficulties in giving consideration to the death penalty, the trial court did not abuse its discretion in striking Juror 42 for cause.

In her voir dire questioning, Juror 24 on several occasions, expressed straightforwardly that she could not consider the death penalty as a possible sentence. Upon questioning by defense counsel, she answered to a hypothetical question that "maybe" she could consider it. She then reverted to her position that she could not consider the death penalty. The trial court did not abuse its discretion by striking this juror for cause.

In summary, we find no reversible error occurred as a result of the various claims raised by Hunt relating to voir dire and jury selection issues.

## XII. BURGLARY WAS PROPERLY USED AS AN AGGRAVATING CIRCUMSTANCE IN IMPOSING THE DEATH PENALTY.

Hunt next contends that it was error for the first-degree burglary charge to be used as the aggravating circumstance that qualified Hunt as death penalty eligible. He argues that his entry into the residence with the intent to murder Bettina was, alone, what elevated the entry to first-degree burglary and that it would, therefore, be improper to use the completion of the murder (the very reason for the entry) as an aggravating circumstance for death penalty purposes. Restated, he observes that under the present state of the law, any time someone unlawfully enters a building to commit murder and does, he is automatically eligible for the death penalty. He also notes that there is an inequity in that if the murder had occurred on the other side of the door, he would not have been death penalty eligible.

We begin by noting that KRS 532.025(2)(a)(2) specifically provides that first-degree burglary is an aggravating circumstance in a murder prosecution. Further, the defendant in *McClellan v. Commonwealth,* 715 S.W.2d 464 (Ky.1986), made substantially the same arguments made by Hunt in the present case. In *McClellan* we squarely rejected that argument, stating:

> [w]e hold that an unlawful entry into a building while armed, with an intent to commit a crime, is a substantially aggravated circumstance to be considered by a jury in determining the appropriate punishment for homicide. The consideration of the aggravated circumstance in this case was in accord with the procedures approved by the United States Supreme Court in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

*Id.* at 472.

Thus *McClellan* is dispositive of this issue; and we, accordingly, reject Hunt's

argument. Hunt acknowledges that *McClellan* is controlling, but asks that we reconsider the holding. We remain convinced in the soundness of the holding, however, and decline Hunt's invitation to revisit the issue.

### XIII. THE USE OF THE BURGLARY CONVICTION AS AN AGGRAVATING CIRCUMSTANCE DOES NOT VIOLATE DOUBLE JEOPARDY.

■ Hunt next contends that convicting him of first-degree burglary and then using that same conviction in the same proceeding as an aggravator to increase the punishment for murder to the death penalty constitutes a second prosecution for the same offense after conviction.

As previously discussed, *McClellan, supra,* addressed and rejected substantially this same argument. In addition, in *Bowling v. Commonwealth,* 942 S.W.2d 293 (Ky.1997), we stated:

> [s]imply because the aggravating circumstance duplicates one of the underlying offenses does not mean that the defendant is being punished twice for the same offense. The underlying offenses were only factors to be considered as to whether the punishment for murder should be death. Appellant was not subjected to double jeopardy or multiple punishment for the same offense.

*Id.* at 308; *see also Fields v. Commonwealth,* 274 S.W.3d 375, 419 (Ky.2008).

Hunt contends that *Bowling,* along with *McClellan,* should be overruled. However, we remain convinced of the soundness of the holding in *Bowling* and will decline Hunt's invitation to revisit the decision.

### XIV. THE VICTIM'S MOTHER PROPERLY TESTIFIED DURING THE SENTENCING PHASE PURSUANT TO KRS 532.055 AND KRS 421.500.

■ During the sentencing phase of the trial, Bettina's mother, Betty Derossett, was called to provide the victim impact statement as authorized by KRS 532.055(2)(a)(7). Hunt argues that pursuant to the definitional provisions of KRS 421.500(1), Bettina's daughter, Veronica Harris, was the only person authorized to be called to present the victim impact statement.

At the time of Hunt's trial, KRS 532.055(2)(a)(7) authorized the Commonwealth in the penalty phase to present evidence concerning "[t]he impact of the crime upon *the victim,* as defined in KRS 421.500, including a description of the nature and extent of any physical, psychological, or financial harm suffered by *the victim* [.]" (emphasis added).[11] In turn, at the time of trial, KRS 421.500(1) defined a *victim,* as relevant here, as follows:

> ... If the victim is deceased and the relation is not the defendant, the following relations shall be designated as "victim" for the purpose of exercising those rights contained in KRS 421.500 to 421.575:
>
> (a) The spouse;
>
> (b) An adult child *if paragraph (a) of this subsection does not apply;*
>
> (c) A parent *if paragraphs (a) and (b) of this subsection do not apply;*
>
> (d) A sibling *if paragraphs (a) through (c) of this subsection do not apply;* and

---

11. The statute has since been amended to read "The impact of the crime upon the *victim or victims,* as defined in KRS 421.500, including a description of the nature and extent of any physical, psychological, or financial harm suffered by *the victim or victims* [.]" Thus, under the amended language, more than one person may give a victim impact statement; and Betty's testimony would have been proper even if Veronica did not testify.

(e) A grandparent *if paragraphs (a) through (d) of this subsection do not apply.*

(Emphasis added).[12]

Hunt argues that the language of the statute (as in effect at that time) provides that if an adult child of the murder victim is alive and available to testify, then only she may be properly classified as a victim under KRS 421.500(1); and, in turn, only she may give the victim impact statement in the sentencing phase of the trial. Bettina's daughter, Veronica, fits that description.

In *Terry v. Commonwealth,* 153 S.W.3d 794 (Ky.2005), Theodore Suggs was murdered by Terry. Suggs's widow, his adult daughter, and his sister were all present in the courtroom during the penalty phase of the trial. The widow chose not to testify. Over Terry's objection, the trial court permitted both the daughter and the sister to present emotionally-charged victim impact evidence.

We held that it was improper for the trial court in *Terry* to have permitted both Suggs's daughter and sister to give victim impact statements. However, in addressing the appropriateness of skipping down the list even though Suggs's widow was alive and present in the courtroom, we stated:

> Appellant contends that since the secondary victim, the widow, was present and declined to testify, neither the daughter nor the sister should have been permitted to testify in her place. We disagree. Paragraph (*l*)(b) of the statute states, "if paragraph (a) of this subsection does not apply;" it does not state, "if there is no spouse." When the widow declined to testify, paragraph (a) did not apply and the adult daughter became the secondary victim who was

entitled to present victim impact evidence. If she had declined to testify, the sister would have become the secondary victim.

*Id.* at 805.

In the present case, Veronica, Bettina's daughter, is placed ahead of Bettina's mother, Betty, on the victim priority list contained in KRS 421.500(1). The record does not disclose why Betty testified instead of Veronica. If Veronica, declined then this case would fall squarely within *Terry*; and her testimony would be deemed proper without further question.

Assuming, however, that Veronica did not specifically decline and, thus, would have been the definitional "victim" under the plain language of KRS 421.500(1), we believe any error was harmless. *See* RCr 9.24 ("No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order, or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."). Be it Veronica or Betty, the Commonwealth was entitled to put on victim impact testimony. Hunt refers to Betty's testimony as being "very personal and emotional testimony ... particularly about the impact of the loss of Bettina on her grandchild[.]" But if Veronica had taken the stand, she would have been testifying about the loss of her mother, and also, it stands to reason, would have noted how Bettina's murder deprived Katrina of her

**12.** The definitional statute has since been amended.

primary caregiver. No doubt Veronica, too, would have become emotional as she told the jury about the loss of her mother with whom she had prior difficulties but with whom she had reconciled prior to the shooting. In light of this, and the overwhelming evidence of Hunt's guilt, we believe any error resulting from Betty testifying instead of Veronica was harmless.

## XV. LETHAL INJECTION AND ELECTROCUTION ARE CONSTITUTIONAL.

Hunt contends that imposition of the death penalty by lethal injection or electrocution is unconstitutional pursuant to the Eighth Amendment of the Federal Constitution and Section 17 of the Kentucky Constitution. The issue is unpreserved.

■ We have consistently held that neither lethal injection nor electrocution is an unconstitutional violation of the Eighth Amendment's proscription against cruel and unusual punishment. *Wheeler v. Commonwealth*, 121 S.W.3d 173, 186 (Ky.2003) ("Wheeler argues that the death penalty is unconstitutional under the federal and Kentucky constitutions because the method used to carry out the sentence, lethal injection, is cruel and unusual punishment. Wheeler's claim that lethal injection is a violation of the Eighth Amendment against cruel and unusual punishment is without any case law support from Kentucky or elsewhere.... Certainly, it is not cruel and unusual punishment. Death by electrocution also does not violate either federal or Kentucky law. *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), *overruled on other grounds by Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Wheeler has also failed to demonstrate that either method of execution conflicts with any societal norms."); *see also Baze v. Rees*, 217 S.W.3d 207, 211–12 (Ky.2006);

*Epperson v. Commonwealth*, 197 S.W.3d 46, 64 (Ky.2006). *Chapman v. Commonwealth*, 265 S.W.3d 156 (Ky.2007); *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).

Hunt has not presented anything causing us to doubt our conclusion that imposition of the death penalty by either lethal injection or electrocution is constitutional.

## XVI. THE PENALTY PHASE INSTRUCTIONS WERE PROPER.

Hunt alleges six errors in connection with the penalty phase instructions: (1) that there was a failure to instruct on non-statutory mitigation factors, (2) that the jury was not instructed that they could consider any mitigating factor they individually believed to be true even if all the other jurors did not find the factor to be true, (3) that the reasonable doubt instruction was flawed, (4) that the instructions did not require the jury to make any findings with respect to non-statutory aggravators, (5) that the instructions did not require the jury to make written mitigation findings, and (6) that a flawed verdict form forced the jury to impose the death penalty if it found an aggravating factor. Hunt concedes that only the first issue is preserved.

### A. Non–Statutory Mitigation.

■ The jury was instructed on four statutory mitigating circumstances: (1) that Hunt had no significant criminal history; (2) that the crime was committed while Hunt was under the influence of extreme emotional disturbance; (3) that at the time of the crime Hunt lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law as a result of intoxication; and (4) the age of the appellant. In addition, the standard mitigating

"catch all" instruction was given. In addition to the foregoing, Hunt requested that the jury be instructed on two additional mitigating factors, (1) that he did not go to Bettina's residence to kill her, but to force her to talk with him and (2) that Hunt and Bettina were in an unstable relationship. Hunt contends that trial court erred by failing to give the requested instructions.

The instruction on mitigating circumstances included the catch-all provisions, "any other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value," and "those aspects of the defendants' character, and these facts and circumstances of the particular offense ... about which he has offered evidence in mitigation...." Due to the catch-all provisions, there was no need to instruct on any specific nonstatutory mitigators. *Haight v. Commonwealth*, 938 S.W.2d 243 (Ky.1996); *Perdue v. Commonwealth*, 916 S.W.2d 148 (Ky. 1995); *Mills v. Commonwealth*, 996 S.W.2d 473, 492 (Ky.1999).

### B. Non–Unanimous Mitigation.

■ Hunt contends that the trial court's instructions required the jury's verdict to be unanimous, but did not instruct them that they could individually consider mitigating circumstances. He alleges that a reasonable juror could have believed the whole jury had to agree unanimously upon a mitigating factor before it could be weighed against the alleged aggravator in arriving at a sentence.

A similar argument was made in *Mills, supra.* "The instructions did not imply that unanimity was required on mitigators and there is no requirement that a jury be instructed that their findings on mitigation need not be unanimous." 996 S.W.2d at 492 (citing *Bowling*, 873 S.W.2d at 180). We accordingly find no error in the instructions as phrased.

### C. Reasonable Doubt Instruction.

■ The reasonable doubt instruction stated as follows: "If upon the whole case you have a reasonable doubt whether the Defendant should be sentenced to death, you shall instead fix his punishment at a sentence of imprisonment." Hunt contends that this instruction told the jury that Hunt could be sentenced to a lesser punishment than death only if there were a reasonable doubt that death was proper penalty.

We addressed this same issue in *Parrish v. Commonwealth*, 121 S.W.3d 198 (Ky. 2003). Therein we stated:

These instructions do not violate the statutory system, nor do they invade the province of the jury. Instruction No. 7 followed the one in 1 COOPER, KENTUCKY INSTRUCTIONS TO JURIES (CRIMINAL) § 12.08 (4th ed. 1999). We find this to be a proper statement of the law. The instructions allowed the jury to consider options other than death, even when a finding is made as to aggravating circumstances. *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872 (1992). There was no error and no violation of either the federal or state constitutions. Instruction No. 7 did not, as Parrish asserts, instruct the jurors that they should impose the death penalty unless they had a reasonable doubt that death was the appropriate penalty.

*Id.* at 207.

Similarly, no error occurred in the present case.

### D. Non–Statutory Aggravator Findings.

Hunt contends that it was error for the instructions to fail to include an instruction requiring the jury to make findings concerning non-statutory aggravators. Citing *Jacobs v. Commonwealth*, 870 S.W.2d 412

(Ky.1994), he contends that because a non-statutory aggravating circumstance can support the imposition of the death penalty, the jury has to be instructed that it must find any such aggravator beyond a reasonable doubt.

■ Hunt's argument is based upon a faulty premise. The death penalty may not be imposed without a finding of a statutory aggravating factor beyond a reasonable doubt. As we stated in *Young v. Commonwealth*, 50 S.W.3d 148 (Ky.2001), "[a]bsent a statutory aggravating circumstance specifically applicable to the defendant or the defendant's own conduct, he/she cannot be subjected to the death penalty." *Id.* at 162. This argument is accordingly without merit.

### E. Written Mitigation Findings.

■ Hunt contends that the penalty phase instructions were erroneous because they failed to require the jury to prepare written mitigation findings. In *Smith v. Commonwealth*, 599 S.W.2d 900 (Ky.1980) defense counsel tendered an instruction along these lines. We held it was not error for the trial court to reject the instruction. *Id.* at 912. Recognizing this, Hunt argues that *Smith* should be overruled. However, we find no compelling need to reconsider this settled issue.

### F. Verdict Form.

■ Hunt asserts that he was denied due process because the penalty phase verdict form directed the jury to fix an aggravated sentence if it found aggravating circumstances. He maintains that the penalty verdict forms presented to the jury made it impossible for the jury to find aggravating circumstances without fixing an aggravated penalty.

The verdict forms used by the trial judge with respect to the offense of murder left a blank space for the jury to write in which aggravating circumstance, if any, it found existed beyond a reasonable doubt and listed instructions to circle one of the following: (1) life without the possibility of parole; (2) life without the possibility of parole for twenty-five years; or (3) death. The court provided verdict forms without aggravating circumstances to impose a sentence for a term of years or a sentence of life in prison. The trial judge used a verdict form found in Section 12.10A of 1 COOPER, KENTUCKY INSTRUCTIONS TO JURIES *(CRIMINAL)*, (4th ed. 1993). This form had been previously approved by this Court in *Hodge v. Commonwealth*, 17 S.W.3d 824, 854 (Ky.2000). The verdict form wherein aggravating circumstances could be and were found did not require the jury to impose any particular sentence. The instructions when considered as a whole, make it clear that the jury was not required to impose a death sentence merely upon a finding of aggravating circumstances. Pursuant to the standards set out by the United States Supreme Court in *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), the verdict forms did not result in an unconstitutional death sentence.

### XVII. HUNT'S DEATH SENTENCE IS NOT ARBITRARY AND DISPROPORTIONATE.

■ Hunt next contends that his death sentence is arbitrary and disproportionate considering the mitigating factors in his case, the specific facts of his case, and other cases in which death was not imposed for similar or worse crimes with significantly less compelling mitigation. He notes that he maintains a good relationship with his ex-wife Regina Mosier, and his half-brother and sister-in-law; that he was gainfully employed his entire adult life until he was severely injured in a coal truck accident; that, his only prior crimi-

nal conviction was a single DUI conviction; and that he was remorseful over his wife's death.

The Commonwealth, through its death penalty statutes, has established a proportionality review process. KRS 532.075(3)(c). Under KRS 532.075(1), "[w]henever the death penalty is imposed for a capital offense . . . the sentence shall be reviewed on the record by the Supreme Court." Further, Subsection (3)(c) provides that "with regard to the sentence, the court shall determine . . . [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Pursuant to KRS 532.075 we have reviewed the record and have determined that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Furthermore, the sentence is not disproportionate to the penalty imposed in similar cases since 1970 considering both the crime and the defendant. Rather than belaboring this opinion with a string cite containing the cases we examined during the course of our proportionality review, we incorporate by reference the list found in *Hodge v. Commonwealth,* 17 S.W.3d 824, 855 (Ky. 2000). We have incorporated that list in other cases, such as *Parrish v. Commonwealth,* 121 S.W.3d 198, 208 (Ky.2003). We have also reviewed the applicable cases rendered after *Hodge. See, e.g., Fields v. Commonwealth,* 274 S.W.3d 375, 420 (Ky. 2008) (giving "particular attention" to other cases involving single murders in performing proportionality review of death sentence in case involving murder in the course of burglary.

We have conducted an independent review of all the circumstances and conclude they justify the imposition of capital punishment.

## XVIII. KENTUCKY'S METHOD OF PROPORTIONALITY REVIEW IS CONSTITUTIONAL.

Hunt contends that this Court's proportionality review process, as prescribed by KRS 532.075(1) is unconstitutional. He states that "The problem with Kentucky's review process is this Court does not compare cases in which the death penalty was imposed to the 'penalty imposed in similar cases.'" He alleges that this Court's universe of cases has been limited solely to those cases in which the death penalty was imposed and not to other "similar cases" in which death was not imposed; and, further, has been limited to only those cases which have been affirmed on appeal. He also contends that he is entitled to access this Court's KRS 532.075(6) data.

■ "Kentucky's proportionality review is constitutional and comports with statutory requirements and the federal Constitution." *Fields v. Commonwealth,* 274 S.W.3d 375, 419 (Ky.2008). We discern no reason to reevaluate this settled issue.

■ Moreover, "[t]here is no right to access this Court's KRS 532.075 review data." *Id.* (citing *Ex parte Farley,* 570 S.W.2d 617, 624 (Ky.1978)). *See also e.g., Epperson v. Commonwealth,* 197 S.W.3d 46, 63 (Ky.2006) ("The concerns expressed by Epperson about his inability to access the data are without merit. This Court does not use any secret data but simply compares one death penalty case with all the other cases in which the death sentence was imposed after January 1, 1970."); *Harper v. Commonwealth,* 694 S.W.2d 665, 670–71 (Ky.1985) ("For some reason, obscure to us, the Public Advocate keeps insisting on access to the data collected by this court under the provisions of KRS 532.075(6). We had thought that [*Ex*

*Parte Farley* ] settled this question. There is no articulated reason why the Public Advocate cannot assemble this data for use in capital cases. We state in our opinions all matters considered by us, and in no way are mysterious and secret records or data taken into account in our deliberations. The time and effort expended in arguing this point would suffice to compile all the data we consider."); *Stopher v. Commonwealth*, 57 S.W.3d 787, 807 (Ky.2001) ("Failure to provide access to data collected by this Court pursuant to KRS 532.075(6) did not deny Appellant due process of law.").

## XIX. THE PROSECUTOR DID NOT IMPROPERLY TELL THE VENIRE THAT IT WOULD MERELY "RECOMMEND" A SENTENCE.

 Hunt contends that error occurred because during individual voir dire, the prosecutor stated to the prospective juror that in the event of a conviction, she would "recommend" a sentence. Hunt cites us to six occasions where this occurred. Two of the six eventually sat on the jury that heard the case and imposed the death penalty. The issue is unpreserved.

In *Caldwell v. Mississippi*, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the U.S. Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *See also Ice v. Commonwealth*, 667 S.W.2d 671, 676 (Ky.1984) (holding that prosecutor's emphasis in closing argument that jury's sentence of death was only recommendation was improper for it conveyed message that jurors' awesome responsibility was lessened by fact that their decision was not final one); *Tamme v. Commonwealth*, 759 S.W.2d 51, 53 (Ky.1988) (holding that in

capital cases, word "recommend" may not be used with reference to jury's sentencing responsibilities in voir dire, instructions, or closing argument).

However, in *Romano v. Oklahoma*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994), the United States Supreme Court discussed the scope of *Caldwell* as follows:

The prosecutor in *Caldwell*, in remarks which "were quite focused, unambiguous, and strong," misled the jury to believe that the responsibility for sentencing the defendant lay elsewhere. *Id.*, at 340, 105 S.Ct., at 2645. The trial judge "not only failed to correct the prosecutor's remarks, but in fact openly agreed with them." *Id.*, at 339, 105 S.Ct., at 2645.

. . . .

[W]e have since read *Caldwell* as "relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright*, 477 U.S. 168, 184, n. 15, 106 S.Ct. 2464, 2473, n. 15, 91 L.Ed.2d 144 (1986). Thus, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989); *see also Sawyer v. Smith*, 497 U.S. 227, 233, 110 S.Ct. 2822, 2826–27, 111 L.Ed.2d 193 (1990).

*Id.* at 9, 114 S.Ct. 2004.

Moreover, we stated in *Matthews v. Commonwealth*, 709 S.W.2d 414 (Ky.1985),

we conclude that although in this area the court and prosecutor must be extremely careful to avoid leaving the jury with any impression that would diminish its 'awesome responsibility' in imposing the death sentence, use of the word 'recommend' is not per se constitutionally

impermissible. It is not incorrect as long as the context in which it is used does not mislead the jury as to its role in the process or its responsibility in exercising its sentencing function.

*Id.* at 421.

Here, the use of the term "recommend" occurred in individual voir dire and then in the case of only two of the venire who eventually served on the trial jury. The prosecutor's use of the term "recommend" was isolated and occurred some fifteen days prior to the jury's sentencing verdict. The prosecutor did not use the term in any of his presentations before the jury as a whole. As such, we do not believe the isolated instance of the prosecutor's use of the term "recommend" left the jury with any impression that would diminish its "awesome responsibility" in imposing the death sentence. No reversible error occurred.

### XX. DEATH QUALIFICATION OF JURORS IS NOT UNCONSTITUTIONAL.

■ Hunt argues that the process of death qualification of jurors is unconstitutional because the qualification process has a prejudicial effect on jurors who end up sitting on the jury.

We have considered, and rejected, this argument before. There is no error in the removal of jurors who cannot consider the entire range of penalties, including the death penalty. *See Hodge v. Commonwealth,* 17 S.W.3d 824, 838 (Ky.2000); *Fields v. Commonwealth,* 274 S.W.3d at 419.

### XXI. HUNT WAS NOT DENIED DUE PROCESS BY USE OF AN AGGRAVATOR NOT CONSIDERED BY A GRAND JURY OR ALLEGED IN HIS INDICTMENT.

■ Hunt alleges that he was denied due process because the issue of whether there was an aggravating circumstance to make him death eligible was not presented to the grand jury and nor was such alleged in the indictment. The issue is unpreserved.

Under Kentucky law, a person is not eligible to receive the death penalty unless at least one of the statutory aggravators set forth in KRS 532.025(2)(a) is found to apply. *See* KRS 532.025(3) ("In all cases unless at least one (1) of the statutory aggravating circumstances enumerated in subsection (2) of this section is so found, the death penalty, or imprisonment for life without benefit of probation or parole, or the sentence to imprisonment for life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years of his sentence, shall not be imposed.").

Hunt's indictment did not describe the aggravators the Commonwealth believed made Hunt eligible to receive the death penalty. Instead, the Commonwealth filed a notice under KRS 532.025 that it was seeking the death penalty. KRS 532.025(1)(a) provides that the Commonwealth may introduce at a capital sentencing hearing "only such evidence in aggravation as the state has made known to the defendant prior to his trial...." That notice set forth the aggravating circumstance that the Commonwealth believed made Hunt eligible to receive the death penalty—that is that the murder occurred during the course of a first-degree burglary. Hunt now contends that his constitutional rights were violated because the issue of aggravating circumstances was not presented to the grand jury, and because the indictment did not cite the aggravating circumstance making him death eligible.

We have rejected arguments along these lines many times before. *See, e.g., Soto v.*

*Commonwealth,* 139 S.W.3d 827, 841–43 (Ky.2004); *Ernst v. Commonwealth,* 160 S.W.3d 744, 752 (Ky.2005) ("Finally, although Appellant argues that the indictment did not set forth the essential elements of the capital kidnapping offense, we also note that the indictment is not required to recite the aggravating circumstance necessary to seek capital punishment so long as the Commonwealth satisfies the notice requirement in KRS 532.025(1)(a)."). For similar reasons, the issue of aggravating circumstances need not be presented to the grand jury.

■ We have been shown no compelling reason to depart from our settled position that the indictment need not recite the aggravating circumstances or, for reasons similar to those as stated above, to impose now a requirement that the aggravating circumstances in a particular case must be presented to the grand jury.

## XXII. THE DEATH PENALTY IS CONSTITUTIONAL.

Hunt contends that the death penalty, as implemented and carried out in Kentucky is unconstitutional because it does not narrow the class of persons eligible for the death penalty; because there is insufficient statutory guidance for imposition of the death penalty; because the death penalty, as applied in Kentucky, is discriminatory; because prosecutorial discretion makes arbitrariness inherent; and because there is a danger of executing the innocent.

"The constitutionality of the death penalty statute is well settled. Appellant's assertion that Kentucky's death penalty statute operates in a discriminatory and arbitrary fashion is without merit." *Thompson v. Commonwealth,* 147 S.W.3d 22, 55 (Ky.2004). "Further, KRS 532.025 provides adequate standards to guide the jury in its consideration and imposition of the death penalty. Finally, the death penalty is not imposed arbitrarily or capriciously in Kentucky." *Fields v. Commonwealth,* 274 S.W.3d at 419. We have repeatedly ruled that Kentucky's death penalty statute is not unconstitutional, and Hunt has presented nothing new which causes us to change that conclusion. *Chapman v. Commonwealth,* 265 S.W.3d 156, 163 (Ky.2007).

## XXIII. RESIDUAL DOUBT DOES NOT BAR THE DEATH SENTENCE.

Hunt contends that residual doubt bars the death sentence.

■ We have addressed this issue on prior occasions, and we see no reason to depart from our consistent holding that residual doubt plays no role in appellate review. *See, e.g., Tamme v. Commonwealth,* 973 S.W.2d 13, 40 (Ky.1998); *Epperson,* 197 S.W.3d at 65 ("The United States Supreme Court and this Court have held that residual doubt is not a mitigating circumstance for the death penalty. *See Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), *accord Tamme v. Commonwealth, supra.* A finding of guilt as to aggravating circumstances in a death penalty case is considered under the reasonable doubt standard. Here, the evidence presented was sufficient to establish guilt beyond a reasonable doubt so as to meet the legal standards and constitutional requirements.").

## XXIV. CUMULATIVE ERROR.

Hunt finally contends that if we do not find any individual issue sufficient to require reversal, then we should set aside his convictions and sentences on the basis of the cumulative errors he has identified.

Our review of the entire case reveals that the appellant received a fundamental-

ly fair trial and that there is no cumulative effect or error that would mandate reversal. *See Funk v. Commonwealth,* 842 S.W.2d 476 (Ky.1992); *Bowling v. Commonwealth,* 942 S.W.2d 293, 308 (Ky.1997).

## CONCLUSION

For the foregoing reasons the judgment of the Floyd Circuit Court is affirmed.

All sitting. All concur.