RENDERED: AUGUST 18, 2023; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky
# Court of Appeals

NO. 2021-CA-1392-MR

DAVID PONS                                                                          APPELLANT

v.
APPEAL FROM BARREN CIRCUIT COURT
HONORABLE JOHN T. ALEXANDER, JUDGE
ACTION NO. 19-CR-00327

COMMONWEALTH OF KENTUCKY                                           APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, DIXON, AND JONES, JUDGES.

JONES, JUDGE: David Pons appeals from the Barren Circuit Court's judgment following conviction at his jury trial. The trial court sentenced Pons to a total of eighteen years' imprisonment for first-degree manslaughter and first-degree wanton endangerment in the shooting death of Christopher Walker. After a thorough review of the facts and the law, we affirm.

I. BACKGROUND

At the time of his trial, Pons and his wife, Melinda Pons, had been married for twenty years and had raised three children together. Unfortunately, Pons suffered from multiple health issues, most notably Crohn's disease and back pain, which caused limitations to his sexual functioning. As a result of his condition, he and Melinda had an openly polyamorous relationship in which she would date other men with his blessing.

In April 2019, Melinda had been dating Christopher Walker for seven or eight months when Walker moved into the Ponses' home in Barren County. Money was scarce, and Walker was able to contribute to the running of the household with his disability benefits. Pons and Walker were on friendly terms and enjoyed watching television together. However, according to Pons, Walker had difficulty controlling his alcohol consumption. Pons claimed that, if Walker knew of any alcohol available in the home, he would drink it until it was gone. For this reason, on April 26, 2019, Melinda bought a half-gallon of vodka and surreptitiously used it to refill an empty fifth bottle for the three of them to drink that evening.[1] By employing this ruse, the Ponses hoped to hide the remainder of

---

[1] A "fifth" bottle of liquor refers to how distilled spirits were previously sold as one-fifth of a gallon. Since January 1, 1980, the federal government has required distilled spirits to be bottled using a metric "standard of fill." A "fifth" is now actually 750 milliliters (ml), which is roughly equivalent to the older "fifth of a gallon" standard. *See, e.g.*, *Goldstein v. Miller*, 488 F. Supp. 156 (D. Md. 1980) (discussing the changes in bottling spirits implemented by 27 Code of Federal

the half-gallon bottle of vodka from Walker so the three of them could enjoy it at some later date.

Later that afternoon, the Ponses and Walker drank some of the vodka together. Both Pons and Melinda agree that the entirety of the fifth was consumed that afternoon, but what happened next is somewhat disputed. Pons testified that he had only a single swallow of the vodka, but Melinda stated that the three of them each drank approximately four shots. Melinda then decided to take a nap. According to Pons, he and Walker got into an argument over alcohol while Melinda was napping. Walker suspected there was more alcohol in the house and demanded to know where it was. Pons lied to Walker, telling him that he thought there was more alcohol, but he did not know where it was, and said they could ask Melinda about it when she awoke from her nap. Walker was unsatisfied with that answer and became increasingly agitated as the two men argued. According to Pons, when he started up from the sofa, Walker pushed him in the chest and forced him to sit. He finally stated that if Pons did not tell him where the alcohol was, he would wake Melinda and get the answer from her.

---

Regulations (C.F.R.) Part 5). Similarly, when Melinda bought a "half-gallon" of vodka, she actually purchased a bottling of 1.75 liters (L) of spirits.

At this point, Walker began walking toward Melinda's bedroom.[2] Pons retrieved his rifle, loaded the magazine, and fired one round into a wall to get Walker's attention. Melinda emerged from the bedroom following the gunshot, and the two men continued to argue. Pons retreated out of the front door of the home, down the porch steps, and into the yard with his rifle. Walker attempted to follow Pons, but Melinda stepped into his path and tried to block him. As Walker and Melinda struggled in the doorway, Pons backed forty or fifty feet into the yard. Pons asserts that Walker was threatening to kill him, and he was backing away; in contrast, the Commonwealth maintains that Pons assumed a kneeling "shooter's stance" in the yard.

The conflict ended in bloodshed when Walker emerged from the residence, with Melinda following behind. Walker advanced toward Pons, with Melinda apparently struggling with Walker to prevent the confrontation. As Walker approached, Pons shot him with his rifle. The medical examiner would later testify that Walker was shot either four or five times; the uncertainty arose from the possibility that two different wounds on Walker's body may have been caused by the same bullet. After shooting Walker, Pons asked Melinda to call 911 because she owned the only working cellphone in the household. According to Pons, Melinda was "hysterical," so he fired his rifle twice into the ground to get

---

[2]  Because of his back issues, Pons was not comfortable in a bed, preferring to sleep on the living room couch instead. Melinda and Walker slept in the bedroom.

her attention. He asked her again to telephone 911, and then he went into the house. Melinda ran into the house for towels. Pons believed she was going to place Walker in the car and take him to the emergency room. He did not know if Melinda ever telephoned 911.

At some point afterward, Pons posted a message on social media which read, "Goodbye, my friends. I just had to shoot someone to keep him from hurting me and my family. I will either be in jail or dead. I am sorry." When Pons's relatives read the social media posting, they became concerned. Pons's cousin, who lived in the area, drove to the Ponses' home. When she got there, she found Melinda and Walker in the parked vehicle. She initially believed they were both asleep, but then noted that the male inside did not appear to be breathing. She telephoned 911 for help. Deputies from the Barren County Sheriff's Office arrived and investigated the vehicle. They initially believed Walker had overdosed on narcotics and noted a strong smell of alcohol in the car. However, the deputies soon discovered Walker had suffered gunshot wounds and appeared to be deceased. The deputies then woke Melinda and removed her from the vehicle. Pons eventually emerged from the house and sat on his porch, choosing not to cooperate with the deputies' commands to show his hands and walk toward them in the yard. Pons was taken into custody shortly thereafter.

As part of the investigation, the lead detective for the sheriff's office noticed a church across the street from the Pons residence, approximately three hundred to four hundred yards away, which was equipped with video surveillance cameras. The detective spoke with the deacon of the church and the security company and obtained raw video footage of the shooting at the Pons residence. Because of the distance from the scene, the detective asked a forensic computer examiner employed at the Kentucky State Police Electronic Crimes Branch to enhance the video. The forensic specialist was able to provide two versions of the enhanced video. The first, an enlarged video which cropped out dead space around the Pons residence and showed Pons, Walker, and Melinda moving in the yard, was referred to as the "unannotated" video. The second version, the "annotated" video, was identical to the first except that it showed glowing ovals around Pons and Walker as they moved on the screen – a blue oval for Pons, and an orange oval for Walker. Melinda was visible in the video, but she was not marked by a glowing oval.

As a result of the incident and the subsequent investigation, the Barren County grand jury indicted Pons on one count of murder[3] and one count of first-degree wanton endangerment.[4] During the trial, the Commonwealth presented

---

[3] Kentucky Revised Statutes (KRS) 507.020, a capital offense.

[4] KRS 508.060, a Class D felony.

testimony to the jury conforming to the above narrative, as well as both versions of the enhanced video. Pons testified in his own defense. He did not deny shooting Walker, but he claimed it was self-defense because Walker was threatening to kill him.

Following the submission of evidence in the case, the jury acquitted Pons of murder but found him guilty of first-degree manslaughter[5] and first-degree wanton endangerment, recommending a consecutive sentence of fifteen years' imprisonment for the manslaughter conviction and three years' imprisonment for wanton endangerment. The trial court thereafter sentenced Pons to a total of eighteen years' imprisonment, in accordance with the jury's recommendation. This appeal followed.

## II. ANALYSIS

Pons presents two issues to this Court on appeal. In his first issue on appeal, Pons argues the trial court erroneously allowed the Commonwealth to play the annotated version of the surveillance video for the jury. Pons admits that the grounds for his objection to the video at the trial court level were different than what he now argues on appeal, stating "the prejudice discussed on appeal was not argued below." (Appellant's Brief at 12.) Despite Pons's argument that the issue is nonetheless "largely preserved," we disagree. When the grounds of the

---

[5] KRS 507.030, a Class B felony.

argument are "different from those asserted in the court below, [they] are not properly preserved for appellate review." *Daugherty v. Commonwealth*, 572 S.W.2d 861, 863 (Ky. 1978) (citations omitted). "Our jurisprudence will not permit an appellant to feed one kettle of fish to the trial judge and another to the appellate court." *Owens v. Commonwealth*, 512 S.W.3d 1, 15 (Ky. App. 2017) (footnote omitted).

Nonetheless, acknowledging that his claim of preservation may not be well taken, Pons alternatively requested palpable error review pursuant to RCr[6] 10.26. "A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that *manifest injustice* has resulted from the error." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006) (emphasis added in *Martin*) (quoting RCr 10.26). A determination of "manifest injustice" is a relatively high threshold for an appellant to clear:

> A palpable error must involve prejudice more egregious than that occurring in reversible error[.] A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings. Thus, what a palpable error analysis boils down to is whether the reviewing court believes there is a substantial possibility that the result in the case would have been different without the error.

---

[6] Kentucky Rules of Criminal Procedure.

*Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006) (internal quotation marks and citations omitted). "To discover manifest injustice, a reviewing court must plumb the depths of the proceeding . . . to determine whether the defect in the proceeding was shocking or jurisprudentially intolerable." *Martin*, 207 S.W.3d at 4.

Pons argues on appeal that the trial court erred in admitting the annotated video because the colored ovals highlighting Walker and Pons deemphasized Melinda's role in the shooting. Because she was not highlighted with an oval, Pons now argues that the annotated video "confused and misled the jury" because the jury would be "less inclined to watch key moments described by [Pons], such as when Walker shoved Melinda, threw 'a few hard swings' at her, and pushed her to the ground." (Appellant's Brief at 18.) By taking the focus off Melinda, Pons asserts the jury was less inclined to believe he was privileged to protect her, which was part of his defense strategy.

After viewing the video, we disagree with Pons's assessment and find ourselves agreeing with the trial court's thoughtful order considering this matter. In its post-trial order explaining its decision to allow the annotated video, the trial court found that the enhanced video was "somewhat difficult to interpret due to the frame rate and the degree of magnification required to make the individuals on the video discernible." (Record (R.) at 191.) The trial court then explained that

placing the ovals around Walker and Pons "allowed the viewer to more easily differentiate between their movements and follow them as they moved around the screen. It also helped to differentiate them from a third person, who was both the Defendant's wife and the victim's girlfriend, and whose actions were also relevant to the case." (R. at 191.) Finally, the trial court ruled that the ovals were helpful in aiding the jury in understanding the video footage, as the individuals in the video were very difficult to track.

We agree with the trial court's reasoning. The trial court correctly pointed out the difficulty in tracking individual movements on the video, as well as how useful the ovals are in differentiating the individuals on the screen. To the jury, the colored ovals were likely as helpful as the highlighted yellow first-down line aiding viewers of a televised football game – a helpful innovation to which sports fans have become accustomed since its inception in 1997.[7] Moreover, and directly contrary to Pons's argument, the trial court noted how the ovals helped to differentiate *Melinda's* movements as well, as she was the only person in the video *without* an oval. Based on these considerations, we discern no error in the trial court's decision – and certainly nothing amounting to a "shocking or

---

[7] *The Making of Football's Yellow First-and-Ten Line*, TODAY'S ENGINEER (JUN. 2010), https://ethw.org/The_Making_of_Football%27s_Yellow_First-and-Ten_Line (last visited Jul. 7, 2023).

jurisprudentially intolerable" defect giving rise to manifest injustice. *Martin*, 207 S.W.3d at 4.

For his second issue on appeal, Pons argues the trial court erroneously failed to grant his motion for a directed verdict on the charge of first-degree wanton endangerment, asserting the Commonwealth failed to produce evidence showing Melinda was in substantial danger of death or serious physical injury when he fired his rifle outside the residence. Pons contends the evidence did not support the Commonwealth's theory that Melinda was ever in danger, as "[his] actions on the front lawn were deliberate and intentional. He knelt, aimed, and fired at Christopher Walker. His bullets struck and felled his intended target." (Appellant's Brief at 22.) Pons asserts that Melinda did not testify that she felt in danger, and the only evidence supporting the Commonwealth's theory that Melinda's proximity to the gunfire put her in danger was the grainy and distant video footage.

In a motion for directed verdict, "the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth" and "must assume that the evidence for the Commonwealth is true[.]" *Hall v. Commonwealth*, 645 S.W.3d 383, 392 (Ky. 2022) (quoting *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991)). Furthermore, to defeat a preserved motion for directed verdict, "the Commonwealth must only produce 'more than a

-11-

mere scintilla of evidence.'" *Lackey v. Commonwealth*, 468 S.W.3d 348, 352 (Ky. 2015) (quoting *Benham*, 816 S.W.2d at 187).

"Firing a weapon in the immediate vicinity of others is the prototype of first[-]degree wanton endangerment." *Hall v. Commonwealth*, 468 S.W.3d 814, 828-29 (Ky. 2015) (citations omitted). Despite Pons's assertion that the Commonwealth produced no proof that Melinda was in the vicinity of the gunfire, Pons's own testimony describes how Walker was pushing and shoving Melinda immediately prior to the shooting. Furthermore, despite the poor quality of the enhanced video footage, it is enough to confirm that Melinda was in Walker's general vicinity when Pons fired the shots. These facts amount to "more than a mere scintilla," which is sufficient to defeat Pons's directed verdict motion. *Taylor v. Commonwealth*, 617 S.W.3d 321, 324 (Ky. 2020).

Finally, there were several instances in Pons's narrative in which he freely admits to firing his rifle into the walls of the house, or into the ground outside, for the sole purpose of *getting someone's attention*. "It is self-evident that bullets may ricochet." *Hunt v. Commonwealth*, 304 S.W.3d 15, 38 (Ky. 2009). Under these facts, we cannot say the trial court's denial of the directed verdict motion was erroneous.

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment and sentence.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Steven J. Buck
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Matthew R. Krygiel
Assistant Attorney General
Frankfort, Kentucky