RENDERED: NOVEMBER 15, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0649-MR

DANIEL BAUER, ADMINISTRATOR
FOR THE ESTATE OF SANDRA
BAUER; DANIEL BAUER,
ADMINISTRATOR FOR THE
ESTATE OF ANDREA BAUER;
DANIEL BAUER, INDIVIDUALLY;
PAMELA KENDRICK BAUER,
ADMINISTRATOR FOR THE
ESTATE OF NEVAEH BAUER;
PAMELA KENDRICK BAUER,
INDIVIDUALLY; NATHAN BAUER,
INDIVIDUALLY; AND BRADEN
BAUER, AN INFANT BY AND
THROUGH HIS MOTHER AND
NEXT FRIEND, PAMELA
KENDRICK BAUER                                                                APPELLANTS


                          APPEAL FROM FLOYD CIRCUIT COURT
v.                        HONORABLE THOMAS M. SMITH, JUDGE
                          ACTION NO. 16-CI-00829


HYUNDAI MOTOR AMERICA, INC.
AND HYUNDAI MOTOR COMPANY,
LTD                                                                            APPELLEES


AND

HYUNDAI MOTOR AMERICA, INC.
AND HYUNDAI MOTOR COMPANY,        CROSS-APPELLANTS
LTD


           CROSS-APPEAL FROM FLOYD CIRCUIT COURT
v.           HONORABLE THOMAS M. SMITH, JUDGE
           ACTION NO. 16-CI-00829


DANIEL BAUER, ADMINISTRATOR
FOR THE ESTATE OF SANDRA
BAUER; DANIEL BAUER,
ADMINISTRATOR FOR THE
ESTATE OF ANDREA BAUER;
DANIEL BAUER, INDIVIDUALLY;
PAMELA KENDRICK BAUER,
ADMINISTRATOR FOR THE
ESTATE OF NEVAEH BAUER;
PAMELA KENDRICK BAUER,
INDIVIDUALLY; NATHAN BAUER,
INDIVIDUALLY; AND BRADEN
BAUER, AN INFANT BY AND
THROUGH HIS MOTHER AND
NEXT FRIEND, PAMELA
KENDRICK BAUER            CROSS-APPELLEES

<u>OPINION</u>
<u>AFFIRMING</u>

** ** ** ** **

BEFORE:  CALDWELL, A. JONES, AND TAYLOR, JUDGES.

JONES, A., JUDGE:  Daniel Bauer, Pamela Bauer, and Nathan Bauer, (collectively, "the Bauers") appeal from a jury verdict in favor of Hyundai Motor America, Inc. and Hyundai Motor Company, Ltd. (collectively, "Hyundai") in a crashworthiness product liability case involving a 2013 Hyundai Tucson.  Hyundai cross-appealed.  After a thorough review of the facts and the law, we affirm the judgment in favor of Hyundai.

## I. BACKGROUND

On December 24, 2015, a 2013 Hyundai Tucson driven by Sandra Bauer collided with a 2012 Chevrolet Cruze driven by Roland Patrick in Floyd County.  Patrick's vehicle crossed the center line of Kentucky Highway 114, causing the two vehicles to collide head-on but slightly offset, with the right front of the Tucson meeting the right front of the Cruze.  The combined speed of the two vehicles was approximately 120 miles per hour, and the results of the collision were both tragic and horrifying.  Patrick, the only occupant of the Cruze, died.  The Tucson was occupied by five members of the Bauer family, three of whom died as a result of the accident.  Sandra Bauer was driving, and her daughter, Andrea

-3-

Bauer, was sitting in the front passenger seat. Pamela Kendrick Bauer[1] was sitting in the left rear passenger seat. Pamela's two young children were sitting in the back of the Tucson with her. Braden, six years old, was sitting in the right rear seat. Nevaeh, four years old, was sitting in the middle rear seat. Sandra, Andrea, and Nevaeh died as a result of the collision.

Approximately one year after the crash, in December 2016, members of the Bauer family filed suit against Hyundai alleging that certain unspecified manufacturing defects in the Tucson contributed to the injuries sustained by its occupants.[2] For nearly a year after the Bauers filed suit, Hyundai repeatedly attempted to discover the specific nature of the manufacturing defect upon which the Bauers based their claims. According to Hyundai, it was not until the Bauers' engineering expert, Dr. O. J. Hahn, filed his third expert disclosure in 2021 that the Bauers arrived at an assertion that the welds in the Tucson's front bumper were too short.

---

[1] Pamela Kendrick and Nathan Bauer had two small children at the time of this collision: Braden, born in 2009, and Nevaeh, born in 2011. After the collision and during the pendency of these proceedings, Pamela and Nathan were married. The record refers to Pamela variously as Pamela Kendrick, Pamela Bauer, and Pamela Kendrick Bauer. Even though she was not yet married to Nathan at the time of the collision, we refer to her here as Pamela Kendrick Bauer for the sake of consistency and because that is how she is named in the notice of appeal.

[2] Daniel Bauer asserted a claim for loss of consortium due to the death of his wife, Sandra Bauer. He also asserted claims as the administrator of Sandra's estate, as well as the estate of his daughter, Andrea Bauer. Pamela Kendrick Bauer asserted claims for her own injuries and on behalf of her son, Braden Bauer, for his injuries. She also asserted a claim as the administrator of Nevaeh's estate. Both Pamela Kendrick Bauer and Nathan Bauer asserted claims based on the loss of companionship for their daughter, Nevaeh Bauer.

For their part, the Bauers were unhappy with the way Hyundai responded to document requests during discovery. First, Hyundai Motor America denied that it possessed any design documents. Rather, it asserted that all design documents were in the possession of Hyundai Motor Company, Ltd., the Korean parent company of Hyundai Motor America. Then, when the parent company eventually provided the discovery, Hyundai provided the documents as they were ordinarily kept, in Korean. These documents included design and manufacturing documents from Hyundai, as well as design and manufacturing documents from the South Korean manufacturer of Hyundai's front bumper assembly, Sungwoo Hitech ("Sungwoo"). The Bauers asked the trial court to compel Hyundai to translate the documents into English, but the trial court declined. There is no indication that the Bauers ever sought out their own translation; however, Hyundai later translated the documents into English for the benefit of its own expert witnesses, and these translated documents were provided to the Bauers.

At this point, it is important to discuss two of the discovery documents and their relevance to the key issue litigated at trial. The first document is designated as Bates Numbered Document 1010, and the second is Bates Numbered Document 976.[3] By themselves, these documents are almost

---

[3] "Bates Numbering is a helpful method for organizing documents that need identification. Medical, legal, and commercial institutions use Bates Numbering to process a large amount of documents. Bates Numbers are added to PDF files in the header and footer to identify pages."

completely indecipherable to a layman, in either English or Korean.[4]  Nevertheless, a significant portion of the two-week trial centered on the interpretations the parties' dueling experts extrapolated from these documents.  As previously stated, Dr. Hahn gave expert testimony on behalf of the Bauers.  In his opinion, Bates No. 1010, a "drawings and specifications document" from Hyundai Motor Company, required the front bumper welds to be at or exceeding a particular length, and several of those welds fell short of those lengths when he measured them.  The top driver side weld of the front bumper, according to Dr. Hahn, should have measured 40 millimeters according to Bates No. 1010.  Yet, when he measured the length of the weld, it was only 31.29 millimeters.  In Dr. Hahn's opinion, the short welds were a significant defect that contributed to the injuries sustained by the Tucson's occupants as "[t]he driver side main rail, being separated from the bumper, could not support the passenger side main rail, resulting in substantial, massive intrusion into the passenger compartment."  (Appellants' Brief at 7.)

Hyundai argued that Dr. Hahn was mistaken, and the front bumper welds did not require a length of 40 millimeters.  As support, Hyundai pointed to

---

*Guide to Bates Numbering in PDF files*, https://www.adobe.com/acrobat/hub/what-is-bates-numbering-pdf.html.  (Last accessed Aug. 27, 2024.)

[4]  On May 6, 2022, the trial court conducted a hearing on the Bauers' motion for a new trial.  During the hearing, counsel for the Bauers described the documents as "damned confusing" before apologizing to the court for his choice of language.  After our own review of the documents, we must confess that it is difficult to fault counsel's colorful description of the documents.

Bates No. 976, an inspection document used by Sungwoo, the manufacturer of the front bumper assembly. According to Hyundai, Bates No. 976 indicates that the allegedly short welds identified by Dr. Hahn were only required to be 30 millimeters in length, not 40 millimeters. The reason for the discrepancy in these figures was revealed in further discovery. Prior to the second deposition of one of Hyundai's expert engineers, Jack Ridenour, the Bauers requested production of all of the materials he reviewed for this case. One of these items was an affidavit provided by Kyung Tae Kwak, a senior research engineer with Hyundai in South Korea. Kwak explained that he is familiar with the manufacture and assembly with the front bumper of the Tucson, and the 40-millimeter specification "does not reflect the final accepted dimension of those welds. . . . The correct accepted length of those welds is 30 mm, with a tolerance of plus 20 percent as indicated in the Sungwoo [discovery documents]." (Record (R.) at 3984-85.)

The Bauers moved to exclude the Kwak affidavit and the English translation of the Sungwoo discovery documents, arguing that Hyundai knew that the length of the welds was at issue, and Hyundai had improperly waited until after Dr. Hahn's depositions to produce this new information. They also moved to exclude one of Hyundai's fact witnesses, Greg Webster, who was to give testimony regarding the foundation of the Hyundai documents. The Bauers argued that Mr. Webster was an employee of Hyundai Motor America, not Hyundai in

South Korea, so he had no direct knowledge of the making and retention of the Korean documents for either Hyundai or Sungwoo. For these reasons, they argued that Hyundai should not be permitted to use Mr. Webster to introduce the documents.

On March 4, 2022, after a hearing on the various motions *in limine*, the trial court granted the Bauers' motion to exclude the Kwak affidavit on grounds that was not timely. (R. at 4135.) However, the trial court also ruled that Mr. Webster would be allowed to testify about the Korean documents, including the Sungwoo documents, as a fact witness.

The two-week trial in this case took place from March 14, 2022, to March 24, 2022. During the trial, the jury heard extensive testimony for the Bauer plaintiffs regarding the facts surrounding the collision, as related by the first responders, eyewitnesses, and the coroner. The jury also heard personal testimony from Daniel Bauer, Nathan Bauer, and a friend of Andrea Bauer, who described how the deaths affected them. Aside from the eyewitness and personal testimonies, however, a substantial portion of the trial involved testimony from experts. Two reconstruction experts gave testimony about the mechanics of the collision. The first was Kenneth Agent, an accident reconstructionist and professor at the University of Kentucky College of Engineering. Jonathan Dixon, a recently retired Kentucky State Police accident reconstructionist, also testified. The

reconstruction experts identified the Cruze as the cause of the accident when it crossed the center line and connected with the Tucson in an offset head-on collision. Furthermore, the toxicology report indicated that Patrick, the driver of the Cruze, was under the influence of prescription drugs.

Ultimately, however, the Bauers' product defect theory was grounded in the video deposition of Dr. Hahn, which was provided to the jury. As previously described, Dr. Hahn testified that the welds of the Tucson failed to comply with Hyundai specifications and requirements, which created a substantial risk of injury to the occupants. Dr. Hahn described the front bumper rail as a critical safety feature, and the failure of the welds was a substantial factor in causing the injuries and deaths suffered by the Bauers inside the Tucson.

Hyundai initially countered Dr. Hahn's testimony with its defense witness, Greg Webster. Mr. Webster holds a master's degree in mechanical engineering and works as a senior group manager in the safety office of Hyundai Motor America. He described his job as monitoring the North American market for safety-related concerns. Mr. Webster testified that, through his employment, he has personal knowledge and regularly works with technical documents from the parent corporation, Hyundai Motor Company in South Korea, and that these documents are kept in the ordinary course of business. Mr. Webster also testified that he was familiar with technical documents from suppliers, including Sungwoo,

which Hyundai obtained and maintained in the ordinary course of business. He confirmed that he had spoken with both Kyung Tae Kwak, the senior research engineer at Hyundai, as well as Sung Jae Lee, an employee at Sungwoo, about the discovered documents, including Bates No. 976. Mr. Webster testified that, based on his personal knowledge as well as these conversations, the discovered documents were authentic. When asked about the Sungwoo documents, including Bates No. 976, Mr. Webster explained that these were quality control documents from the bumper supplier, and that Bates No. 976 indicates that the top weld of the driver's side bumper should be 30 millimeters.

It should be noted that the Bauers objected to this line of testimony, arguing that Mr. Webster could not properly authenticate the business documents because he was not the creator or custodian of the records. Furthermore, the Bauers objected to Mr. Webster giving what they considered to be opinion testimony about the length of the welds. The trial court agreed with Hyundai that a proper foundation for the documents was presented by Mr. Webster's testimony. Under cross-examination, the Bauers elicited testimony from Mr. Webster in which he stated he did not author or participate in the production of the documents. Mr. Webster believed that the documents were originally produced, in Korean, by Mr. Kwak through Hyundai's lawyers. He then stated his belief that the documents were provided in discovery approximately one year before trial.

Following Mr. Webster's testimony, the most significant expert testimony on the length of the welds came from Jack Ridenour. An automotive engineer with fifty years of experience, Mr. Ridenour worked for General Motors and Ford before retiring from Ford in 2008 and starting his own consulting firm. He also testified that he had experience in front end design, including bumpers. Prior to his retirement from Ford, he worked as the chief safety engineer at Ford's automotive safety office. Mr. Ridenour informed the jury that Hyundai hired him to evaluate the performance of the vehicle structure in the crash. Of the hundreds of accidents Mr. Ridenour has investigated, he testified that this crash was "extremely severe," one of the ten worst he has seen in his fifty-year career. The only incident that he could recollect as being comparable or worse was one in which a Lamborghini was driven at 170 miles per hour into a wall. Despite the Hyundai Tucson being what he called a very safe vehicle for front crashes; Mr. Ridenour opined that the rapid deceleration[5] of the Tucson was disastrous for the vehicle's occupants.

When asked if he believed Dr. Hahn's assertion that the front bumper welds were short, Mr. Ridenour said they were not. He based his conclusion on his

---

[5] In accident reconstruction terms, experts refer to what is called the "delta-V," which is the change in velocity from immediately before the accident to immediately afterward. Experts for Hyundai believed the delta-V for the Tucson in this case was fifty-six miles per hour, which they considered extremely severe. The Bauers' expert, Kenneth Agent, disagreed and stated that the delta-V of the Tucson was, at most, forty-four miles per hour. The jury heard both figures and the attendant reasoning from each side's experts during trial.

review of the engineering drawings, specifications, and quality control documents. Specifically, he stated that the front bumper welds were supposed to be 30 millimeters long, with a tolerance of up to 36 millimeters. For this Tucson, Mr. Ridenour testified that all welds were within the appropriate specifications. When asked to comment on Dr. Hahn's theory that the torn bumper welds caused intrusion into the driver's compartment, Ridenour said, "that's the craziest thing I've ever heard. . . . totally contrary to physics. It's not what crash forces do." In Mr. Ridenour's opinion, the weld length was of no consequence in this crash because the crash was over by the time the bumper actually separated.

When cross-examined by the Bauers, Mr. Ridenour was asked to explain the reference to the 40-millimeter figure on Bates No. 1010. Mr. Ridenour said that 40 millimeters referred to the "total dimension" in the drawing, but the weld itself was 30-35 millimeters. The Bauers then asked him whether the amount he earned from this case was unusually high, alluding to the more than $100,000 he had been paid by Hyundai. Mr. Ridenour answered by stating, "Most cases don't last three and a half years and have fifteen different allegations." On redirect examination, Hyundai asked Mr. Ridenour to clarify that Dr. Hahn's weld theory was the fifteenth presented by the Bauers. Mr. Ridenour stated that it was, and that there was no merit to the previous fourteen arguments, either.

-12-

The last expert to testify directly regarding the welds was Dr. Viola Acoff, who is employed as a professor of metallurgical and materials engineering at the University of Alabama. Dr. Acoff testified that she has a special expertise in the area of welding metallurgy, and Hyundai had retained her to testify as to the quality of the welds. After her examination, she determined that some of the welds were torn out by the high energy of the collision, but the welds themselves were "good quality welds, they were not defective, and [she] saw no issues with the welds whatsoever." However, she admitted on cross-examination that she was not retained to opine on the length of the welds. On redirect, Dr. Acoff testified that she did not examine the effect of weld length because the Bauers did not conduct any testing themselves on that point, so there was nothing for her to evaluate.[6]

After closing arguments, the jury deliberated for approximately one and a half hours before returning a verdict. In the first interrogatory, the jury was asked, "Are you satisfied from the evidence that a manufacturing defect existed in the front bumper welds of the 2013 Hyundai Tucson in question at the time it was manufactured?" The jury marked the line for "no" and unanimously returned a verdict for Hyundai. Approximately two weeks later, on March 30, 2022, the trial

---

[6] One of Hyundai's themes during the trial was that Dr. Hahn, one of the Bauers' main experts, had not performed any modeling with respect to how the weld length affected the collision. According to Hyundai, Dr. Hahn's opinion that the weld length was a factor in severity of the collision was merely an untested and unsupportable hypothesis.

court entered a final judgment in accordance with the jury's verdict. Two days later, the Bauers moved the trial court for a new trial pursuant to CR[7] 59.01. Following a hearing on the motion, the trial court denied the motion for a new trial on May 18, 2022. This appeal and Hyundai's cross-appeal followed.

## II. STANDARD OF REVIEW

The Bauers present the same three arguments on appeal as they presented in their CR 59.01 motion. Specifically, they allege: (1) Hyundai committed misconduct during discovery; (2) the trial court erred in allowing Bates No. 976 into evidence; and (3) there was insufficient evidence to support the jury verdict. Before analyzing each issue, we must determine the appropriate standard of review.

"Our standard of review in matters involving a trial court's rulings on evidentiary issues and discovery disputes is abuse of discretion." *Manus, Inc. v. Terry Maxedon Hauling, Inc.*, 191 S.W.3d 4, 8 (Ky. App. 2006) (citations omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

Our review of a trial court's decision on a CR 59.01 motion is a two-step process. "The trial court must first determine if the grounds for a new trial

---

[7] Kentucky Rules of Civil Procedure.

-14-

under CR 59.01 exist, which will be reviewed for clear error. If such circumstances exist, the decision whether to grant a new trial lies within the sound discretion of the trial court[.]" *Gibson v. Fuel Transport, Inc.*, 410 S.W.3d 56, 62 (Ky. 2013) (quoting *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 72 (Ky. 2010)).

### III. ANALYSIS

#### A. *Alleged Discovery Misconduct*

Pursuant to CR 59.01(b) a new trial may be granted due to the misconduct of the prevailing party, or of his attorney. In their first issue on appeal, the Bauers argue Hyundai committed misconduct during discovery when it "purposefully and egregiously withheld from the Bauers the fact that it would claim at trial that 30 millimeters, not 40 millimeters, was the required length" of the welds. (Appellants' Brief at 16.) The Bauers allege that Hyundai purposefully allowed Dr. Hahn to give a video deposition on his 40-millimeter weld theory while holding information about the 30-millimeter specification found in Bates No. 976 in reserve, in what amounted to a case of "bushwhacking or sandbagging."

For its part, Hyundai argues that this issue is not preserved for review because the misconduct claim was not raised in a contemporaneous trial objection; rather, it was asserted for the first time in the Bauers' CR 59.01 motion for a new trial. Alternatively, Hyundai urges us to reject the claim because there is no support for it in fact or law.

-15-

Discovery misconduct is serious. "Pretrial discovery simplifies and clarifies the issues in a case; eliminates or significantly reduces the element of surprise; helps to achieve a balanced search for the truth, which in turn helps to ensure that trials are fair; and it encourages the settlement of cases." *LaFleur v. Shoney's, Inc.*, 83 S.W.3d 474, 478 (Ky. 2002). To this end, trial courts are vested with an enormous amount of discretion in addressing violation of their discovery orders. *Turner v. Andrew*, 413 S.W.3d 272, 279 (Ky. 2013). "This includes the decision to impose, or not impose, even the most severe sanctions against a party for failing to comply with discovery orders." *Johnson v. Wood*, 626 S.W.3d 543, 551 (Ky. 2021).

The proper method to seek redress for discovery misconduct is through a CR 37.02 motion for sanctions. Such motions should, in the normal course, be filed before the jury returns its verdict. Notably, granting a new trial is not one of the sanctions CR 37.02 lists as appropriate for a discovery violation. This, of course, is because discovery misconduct should be addressed prior to trial. Had the Bauers raised the discovery misconduct issue prior to trial, the trial court could have considered whether to impose sanctions on Hyundai. *Bramblett v. Penske Truck Leasing Company, L.P.*, 598 S.W.3d 567, 575 (Ky. App. 2019). Such sanctions could have even included an order barring Hyundai from claiming at trial that the weld length was supposed to be 30mm. *See* CR 37.02(2)(b).

If there was an issue of overall misconduct during discovery, and it was prevalent to the point of manifesting clear error, the Bauers should have recognized this misconduct and brought it to the trial court's attention prior to trial, and not for the first time in a post-judgment motion following an adverse jury verdict. The trial court was not provided with a timely opportunity to consider discovery sanctions prior to the jury's verdict. This being the case, we cannot conclude that the trial court erred in not granting a new trial based on Hyundai's alleged discovery misconduct.

### B.   Introduction of Bates No. 976

For their second issue on appeal, the Bauers contend the trial court erroneously permitted the introduction of Bates No. 976 through the testimony of Greg Webster and in allowing him to read "30 millimeters" from that document to the jury. Hyundai argues, and the Bauers admit, that Dr. Hahn referred to one of the other Korean documents in the video deposition presented to the jury. Hyundai thereafter argues that the "rule of completeness" should be used here to allow the presentation of "any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." KRE[8] 106. Alternatively, Hyundai argues that Bates No. 976 was properly admitted as a business record pursuant to KRE 803(6).

---

[8]  Kentucky Rule of Evidence.

-17-

Bates No. 976 was among the set of Sungwoo documents Hyundai produced during discovery. The Bauers admit they first introduced part of the set of Sungwoo records into evidence. Specifically, during his video deposition, Dr. Hahn referred to a diagram on one of these documents to prove human involvement in the manufacturing process.[9]

"Generally stated, 'opening the door' to otherwise inadmissible evidence is a form of waiver that happens when one party's use of inadmissible evidence justifies the opposing party's *rebuttal of that evidence* with equally inadmissible proof." *Commonwealth v. Sto*ne, 291 S.W.3d 696, 702 (Ky. 2009) (emphasis added). Accordingly, KRE 106 "allows a party to introduce the remainder of a statement offered by an adverse party for the purpose of putting the statement in its proper context and avoiding a misleading impression." *Soto v. Commonwealth*, 139 S.W.3d 827, 865-66 (Ky. 2004). The determinative factor is whether the meaning of the included portion is altered by the excluded portion. *Sykes v. Commonwealth*, 453 S.W.3d 722, 726 (Ky. 2015). However, "KRE 106 does not 'open the door' for introduction of the entire statement or make other portions thereof admissible for any reason once an opposing party has introduced a portion of it." *Schrimsher v. Commonwealth*, 190 S.W.3d 318, 331 (Ky. 2006).

---

[9] Dr. Hahn's video deposition was played for the jury in lieu of his live testimony at trial.

Hyundai wished to admit Bates No. 976 for the purpose of proving the proper length of the welds. While Bates No. 976 came from the same set of documents as the document Dr. Hahn referred to in his deposition, Hyundai was not relying on Bates No. 976 to contradict testimony regarding human involvement in the manufacturing process or otherwise place the Sungwoo document Dr. Hahn referred to in the proper context. As such, KRE 106 did not authorize admission of Bates No. 976 into evidence.

Therefore, we must consider whether the document was admissible in its own right. To this end, Hyundai asserts the trial court properly admitted Bates No. 976 as a business record. KRE 803(6) governs the "records of regularly conducted activity" exception to the hearsay rule. Such records are admissible:

> if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by *the testimony of the custodian or other qualified witness*, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

KRE 803(6) (emphasis added). The Bauers argue that Mr. Webster was not a "qualified witness," asserting he knew nothing about Bates No. 976 or any of the other Sungwoo documents and that the entirety of his knowledge came from conversations with Mr. Kwak at Hyundai and Mr. Lee at Sungwoo. (Appellants' Brief at 17.)

At trial, Mr. Webster testified that he had personal knowledge of Hyundai and Sungwoo documents from his employment experience, and that he regularly works with technical documents from Hyundai in South Korea, despite being an employee of Hyundai Motor America. Mr. Webster also testified that Hyundai has a regular practice of obtaining and storing documents from suppliers, including Sungwoo. He believed these documents from Sungwoo were authentic based on this personal experience, and he confirmed his belief through his personal conversations with Mr. Kwak and Mr. Lee. On cross-examination, Mr. Webster admitted he did not author or participate in the production of the documents, nor did he review the documents for production in discovery. Mr. Webster believed Mr. Kwak was the person responsible for producing the documents in discovery, along with Hyundai's counsel, and the documents were produced about one year prior to trial.

The trial court allowed Mr. Webster to serve as a "qualified witness" under KRE 803(6) based on the Kentucky Supreme Court's ruling in *Hunt v. Commonwealth*, 304 S.W.3d 15 (Ky. 2009):

> Anyone who can testify from personal knowledge about the circumstances surrounding the making and keeping of the records can qualify as a foundation witness. As stated by one authority, "in the end the requirement may be satisfied by the testimony of anyone who is familiar with the manner in which the record was prepared, and even if he did not himself either prepare the record or even observe its preparation."

*Id.* at 39-40 (quoting ROBERT LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 8.65 at 463 (3d ed. 1993)). Although authentication is not the same as admissibility, *see Matthews v. Commonwealth*, 163 S.W.3d 11, 23 (Ky. 2005), we are also mindful of KRE 901(a), which states, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

Here, it appears that Mr. Webster was sufficiently acquainted with Hyundai's creation and keeping of engineering documents that the trial court believed Hyundai had laid a "pretty good" foundation for the admission of Bates No. 976. Contrary to the Bauers' assertions, Mr. Webster did not ground his testimony regarding these documents entirely on the conversations he had with Mr. Kwak and Mr. Lee, but rather that these conversations confirmed his belief in their authenticity.

Even though these specific documents may have been transmitted to Hyundai for the purpose of this litigation, they were of the type regularly kept by Hyundai in the regular course of its business and were admissible as business records. *St. Clair v. Commonwealth*, 140 S.W.3d 510, 538 (Ky. 2004); *R.T. Vanderbilt Co., Inc. v. Franklin*, 290 S.W.3d 654, 665 (Ky. App. 2009). While perhaps a close question under these facts, we cannot conclude the trial court

-21-

abused its discretion when it allowed the introduction of Bates No. 976 into evidence.

However, even if Mr. Webster's testimony and Bates No. 976 were erroneously admitted, they would not warrant the grant of a motion for a new trial because Hyundai's 30-millimeter argument did not rest entirely on Mr. Webster's testimony. Jack Ridenour effectively and unequivocally testified that, from his review of the engineering documents and specifications, Dr. Hahn's assertions regarding the short bumper welds were incorrect, and the proper length for the top bumper weld was 30 millimeters. When there is testimony in the record which duplicates the testimony forming the basis of an appellant's objection, the latter is, at most, harmless error. *Davis v. Commonwealth*, 147 S.W.3d 709, 726 (Ky. 2004). Based on these factors, we cannot say that the trial court committed clear error in denying the CR 59.01 motion on this issue.

## C. Sufficiency of the Evidence

For the Bauers' third and final issue on appeal, they contend the trial court erred when it denied their CR 59.01 motion for a new trial based on insufficient evidence to support the jury's determination that the welds were not defective. The Bauers argue that, even if Mr. Webster's testimony and Bates No. 976 were allowed into evidence, there was no evidence (1) Hyundai switched from 40 millimeters to 30 millimeters for its weld specification; (2) Hyundai modified,

changed, or in any way departed from its original drawings in Bates No. 1010; (3) Bates No. 976 indicated that all welds were now to be 30 millimeters; (4) Bates No. 976 was relevant to the time of manufacture of the Bauer Tucson's front bumper assembly; (5) the Bauer Tucson only needed to comply with a 30-millimeter length on the top and bottom welds; or that (6) the Bauer Tucson front bumper assembly was manufactured by Sungwoo. (Appellants' Brief at 19.)

This argument regarding insufficiency of the evidence fails in at least two respects. First, the Bauers' arguments improperly shift the plaintiffs' burden at trial. It is the plaintiffs' responsibility to show evidence of a manufacturing defect and its role as the probable cause of an accident. *Midwestern V. W. Corp. v. Ringley*, 503 S.W.2d 745, 747 (Ky. 1973). Second, Hyundai presented significant evidence to the jury indicating that its product was not defective, most notably in the form of Jack Ridenour's testimony. The jury, as the finder of fact, had the right to believe this testimony over that submitted by the Bauers. "It has long been held that the trier of fact has the right to believe the evidence presented by one litigant in preference to another[.]" *D.W. Wilburn, Inc. v. H&H Painting, LLC*, 648 S.W.3d 687, 695 (Ky. App. 2022) (citation omitted). For these reasons, the trial court did not err in denying the Bauers' CR 59.01 motion on this issue.

## III. CROSS-APPEAL

In its protective cross-appeal, Hyundai argues the trial court should have excluded Dr. Hahn's testimony because it was not grounded in data or testing and amounted to mere *ipse dixit* statements which should have been excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575 (Ky. 2000). As we have stated previously, however, "our resolution of the issues raised on direct appeal renders the issue[s] raised on cross-appeal moot. No discussion is necessary or warranted." *Stanziano v. Cooley*, 598 S.W.3d 82, 88 (Ky. App. 2019).

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.


ALL CONCUR.

BRIEFS FOR APPELLANTS /
CROSS-APPELLEES:

Joe C. Savage
Lexington, Kentucky

John C. Collins
Salyersville, Kentucky

Don McFarland
William Tinker
Salyersville, Kentucky

BRIEF FOR APPELLEES /
CROSS-APPELLANTS:

David T. Schaefer
Jeremy S. Rogers
Louisville, Kentucky

Robert W. Maxwell
Covington, Louisiana

C.V. Reynolds
Prestonsburg, Kentucky